RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NEW DOE CHILD #1; NEW DOE CHILD #2; NEW DOE PARENT; NEW ROE CHILD #1; NEW ROE CHILD #2; NEW ROE PARENT; NEW POE CHILD; NEW POE PARENT; NEW COE CHILD; NEW COE PARENT; NEW BOE CHILD; NEW BOE PARENT; NEW HOE CHILD #1; NEW HOE CHILD #2; NEW HOE PARENT #1; NEW HOE PARENT #2; HOLLY HUBER; MITCHELL KAHLE; BERNARD KLEIN; MARNI HUEBNER-TIBORSKY; LOREN MILLER; MARTIN MAIER; MICHAEL HOWARD; LARRY KNIGHT; DEVIN KUCHNYA; TRACEY MARTIN; MARK PETRICCA; BEVERLY SHAPIRO; RON THOMAS; DEREK ROSE; GEORGE SHIFFER; NANCY DOLLARD; DENNIS ROSENBLUM; JOSEPH MILON; SALVATORE SALERNO; JESSICA MCQUARTER; SUSAN CARRIER; SARAH MAXWELL; STUART CHISOLM; MICHAEL MARTINEZ; ADAM CLAYMAN; MICHIGAN ATHEISTS; NORTHERN OHIO FREETHOUGHT SOCIETY,

> No. 16-4345

*Plaintiffs-Appellants*,

*v.*

CONGRESS OF THE UNITED STATES OF AMERICA,

*Defendant*,

UNITED STATES OF AMERICA, DEPARTMENT OF THE TREASURY; UNITED STATES MINT; UNITED STATES BUREAU OF ENGRAVING AND PRINTING; THE AMERICAN LEGION; AMERICAN CENTER FOR LAW AND JUSTICE,

*Defendants-Appellees*.

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:16-cv-00059—Benita Y. Pearson, District Judge.

Argued:  June 16, 2017

Decided and Filed:  May 29, 2018

Before:  NORRIS, MOORE, and STRANCH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael Newdow, Nice, California, for Appellants. Lowell V. Sturgill, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Michael Newdow, Nice, California, Thomas M. Horwitz, Westlake, Ohio, for Appellants. Lowell V. Sturgill, Jr., UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Eric Rassbach, Diana M. Verm, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., Jay Alan Sekulow, AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C., for Amici Curiae.

STRANCH, J., delivered the opinion of the court in which NORRIS, J., joined, and MOORE, J., joined in part. MOORE, J. (pp. 20–30), delivered a separate opinion dissenting from Part II.A.4 of the majority opinion.

---

## OPINION

---

JANE B. STRANCH, Circuit Judge. Atheists, Humanists, and one Jewish Plaintiff challenge the federal statutes requiring inscription of the National Motto, "In God We Trust," on U.S. currency. Plaintiffs allege that the currency statutes cause them to bear, affirm, and proselytize an objectionable message in a way that, for the Atheist and Humanist Plaintiffs, violates their core religious beliefs, and, for the Jewish Plaintiff, renders him complicit in the sins of superfluously printing God's name and destroying God's printed name. Plaintiffs claim that the statutes violate their rights under the Religious Freedom Restoration Act of 1993 (RFRA), the Free Exercise and Free Speech Clauses of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment, as incorporated by the Due Process Clause of the Fifth Amendment. The district court dismissed all claims under Federal Rule of Civil Procedure 12(b)(6). For the reasons below, we **AFFIRM**.

## I. BACKGROUND

### A. Plaintiffs' Allegations

Plaintiffs are nine anonymous children, seven of their anonymous parents, and twenty-four named individuals who identify as Atheist and/or Humanist (or otherwise profess disbelief

in a God or Gods); one Jewish individual; and two organizations whose members identify as Atheist, Michigan Atheists and Northern Ohio Freethought Society.    Broadly speaking, Plaintiffs' First Amended Complaint (Complaint) alleges that the inscription of the Motto "In God We Trust" on U.S. currency, as required by 31 U.S.C. § 5112(d)(1) (coins) and § 5114(b) (bills), violates their individual rights under RFRA and various constitutional provisions.

Plaintiffs allege that the Motto's inscription on U.S. currency places a substantial burden on their religious exercise in violation of RFRA in three primary ways.  The Motto's inscription on the currency allegedly causes Plaintiffs to:  (1) "personally bear a religious message that is the antithesis of what they consider to be religious truth"; (2) affirm as true a statement they believe to be false (both that God exists and that "we" as Americans trust in God) when "their religious ideologies mandate that they act with honesty"; and (3) "proselytize for a religious claim that is completely contrary to their personal religious opinions."  Most of the allegations state that Plaintiffs object to carrying, affirming, and proselytizing a message whose *content* contradicts their religious beliefs, but some allegations assert that Plaintiffs' religious beliefs specifically forbid the very *acts* of carrying, affirming, or proselytizing the Motto.  The single Jewish Plaintiff alleges that it is sinful for him to participate in an activity that involves the superfluous printing of God's name on secular documents and that leads to the destruction of that printed name (when currency is destroyed).  Plaintiffs allege that carrying and transacting with U.S. coins and bills is often necessary to participate in everyday commerce.  By forcing Plaintiffs to choose between not using cash and violating their religious beliefs, Plaintiffs allege, the Government has substantially burdened their religious exercise without a compelling interest as required by RFRA.

Plaintiffs' Free Exercise claim has a similar basis, while further alleging that the challenged statutes are impermissibly "aimed at the promotion or restriction of religious beliefs." Plaintiffs provide sixty pages of allegations regarding the history of the Motto and its placement on money, which allegedly demonstrate the Government's consistent, longstanding intent to promote Christian monotheism by including the Motto on the currency.  Plaintiffs' Free Speech claim alleges that the Government intentionally compels Plaintiffs to proselytize when they pass currency to others.  Finally, Plaintiffs allege that the Government's inscription of the Motto on

the national currency denies equal dignity to Plaintiffs' religious views, contributing to cultural stigma, alienation, and denigration of their views in violation of the Equal Protection component of the Fourteenth Amendment, as incorporated by the Fifth Amendment.

In January 2016, Plaintiffs initiated this lawsuit against Congress, the United States, the Secretary of the Treasury, the Principal Deputy Director of the Mint, and the Director of the Bureau of Engraving and Printing. Plaintiffs later voluntarily dismissed Congress. Plaintiffs asked the court to declare that 31 U.S.C. §§ 5112(d)(1) and 5114(b) violate RFRA and the Constitution and to permanently enjoin Defendants from producing currency inscribed with "In God We Trust."

The district court dismissed all of Plaintiffs' claims for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). It analyzed the RFRA and Free Exercise claims together and concluded that Plaintiffs had not alleged a substantial burden on their religious exercise. Plaintiffs could avoid cash by using credit cards and checks. The court concluded that cash-only transactions did not compel Plaintiffs to proselytize a message that violates their religious beliefs, analogizing to a Supreme Court case that suggested the Motto's inclusion on currency was not compelled speech. *See Wooley v. Maynard*, 430 U.S. 705, 717 n.5 (1977). The court dismissed Plaintiffs' Free Speech claim for the same reason, again relying on *Wooley*. Finally, the court dismissed Plaintiffs' Equal Protection claim because it concluded that the challenged statutes do not treat different classes of people disparately. Plaintiffs timely appealed.

## II. ANALYSIS

We review de novo a district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6). *Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 533 (6th Cir. 2014). "To survive a motion to dismiss, the plaintiff need only plead sufficient factual matter, which we must accept as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court relies primarily on the complaint, which we construe in the light most favorable to the plaintiff. *Laborers' Local 265 Pension Fund v. iShares Trust*, 769 F.3d 399, 403 (6th Cir. 2014).

## A. Plaintiffs' RFRA Claims

### 1. Legal Framework

RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the Government "demonstrates that the application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). A person whose religious exercise has been burdened may assert a claim against the Government under RFRA. *Id.* § 2000bb-1(c). If the claim is successful, courts may craft exceptions to statutory government programs to accommodate religious beliefs, but the Government may resist such accommodations with "evidence" that they would "seriously compromise its ability to administer the program." *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 435 (2006). Similarly, although the Government may be required to expend additional funds for such accommodations, the cost to the Government of modifying a program is an important factor in determining the viability of an accommodation for purposes of the least-restrictive-means analysis. *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2781 (2014) (citing 42 U.S.C. § 2000cc-3(c)); *see also id.* at 2787 (Kennedy, J., concurring) (noting that certain less restrictive means might not be viable if it would be "more difficult and expensive to accommodate a governmental program to countless religious claims").[1]

In sum, to survive a motion to dismiss, a complaint must allege the following elements of a RFRA claim: (1) the plaintiff seeks to engage in (or avoid engaging in) conduct that constitutes an exercise of religion; (2) the Government has placed a substantial burden on that plaintiff's exercise of religion; and (3) the Government either has no compelling interest in imposing that burden or (4) the Government has another less restrictive means of achieving its compelling interest.

---

[1]RFRA's framework differs from the Supreme Court's test for First Amendment-based free exercise claims, which are governed by the standard set forth in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878 (1990).

2. Standing

Before addressing whether Plaintiffs have sufficiently alleged a RFRA claim, we consider the Government's argument that some of the Plaintiffs lack standing to bring RFRA claims because they have not established Article III injury-in-fact. *See Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 206 (6th Cir. 2011) (recognizing standing as a "threshold matter").

Some Plaintiffs allege injury in the form of stigma, ridicule, peer pressure, and exposure to religious dogma, which the Government argues are insufficient for Article III standing. The Complaint lists certain allegations specific to individual Plaintiffs, and it is true that some individualized allegations state merely that a Plaintiff feels offense or fears ridicule. The Complaint, however, is not limited to these individual allegations. Read in full, the Complaint's allegations go beyond mere "observation of conduct with which one disagrees." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982) (denying standing to taxpayers who alleged their tax payments were used in violation of the Establishment Clause but did not allege any direct connection or exposure to the misuse). The Complaint alleges not only that Plaintiffs take offense at the Motto's inscription on currency, but also that the Government has burdened all the Plaintiffs' religious beliefs by pressuring them to alter personalized conduct in which they regularly engage. *Cf. Washegesic v. Bloomingdale Pub. Sch.*, 33 F.3d 679, 683 (6th Cir. 1994) (concluding that Establishment Clause plaintiff had standing because he "has continuing direct contact with the object at issue," and therefore the injury was "not remote, vicarious or generalized as in *Valley Forge*"). An allegation that the Government is compelling a particular person to violate personal religious beliefs (as opposed to an allegation by a taxpayer that the Government has violated a generalized constitutional mandate) states an Article III injury-in-fact. Construing the Complaint in the light most favorable to the Plaintiffs and accepting its allegations as true, Plaintiffs allege injury-in-fact sufficient for Article III.

Certain members of Congress and others argue as amici curiae that all Plaintiffs lack Article III standing because they "have not alleged any governmental coercion to do, or refrain from doing, anything." This argument appears to conflate Article III injury-in-fact with RFRA's

substantial burden element.    Whether Plaintiffs have alleged an injury-in-fact sufficient for Article III standing is distinct from the analysis of whether they have alleged a substantial burden on their religious exercise under RFRA.   "[J]urisdiction is not defeated by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citation and ellipses omitted).

> Rather, the district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another, unless the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.

*Id.* (citation and internal quotation marks omitted).   Because the existence of Plaintiffs' right to recover depends on how RFRA is applied, the district court had subject matter jurisdiction. Furthermore, Article III does not appear to require injuries caused by government coercion, even if stating a RFRA claim might.    *Cf. Washegesic*, 33 F.3d at 681–83 (recognizing that psychological injury caused by seeing school's portrait of Jesus Christ was sufficient continuing injury-in-fact for an Establishment Clause claim even after the student had graduated and only returned to the school for social purposes).   RFRA explicitly states that it permits standing for claims to the full extent permitted by Article III.   42 U.S.C. § 2000bb-1(c).   We accordingly reject the standing arguments of Defendants and amici.

### 3. Exercise of Religion

To state a RFRA claim, Plaintiffs' Complaint must first allege that the conduct at issue is an exercise of religion.   *See* 42 U.S.C. § 2000bb-1(a).   In assessing whether a plaintiff has alleged a protected exercise of religion, the court's function is to ensure that the claim is based on a sincere religious belief.   *Hobby Lobby*, 134 S. Ct. at 2779.   Courts are "to determine whether the line drawn" by the plaintiff between conduct consistent and inconsistent with her or his religious beliefs "reflects an honest conviction."   *Id.* at 2779 (internal quotation marks omitted) (quoting *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 716 (1981)).

Sincerity is distinct from reasonableness.   *Hobby Lobby* teaches that once plaintiffs allege that certain conduct violates their sincerely held religious beliefs as they understand them, it is

not within the court's purview to question the reasonableness of those allegations. *Id.* at 2777–78. Nor is it the court's role "to say that their religious beliefs are mistaken or insubstantial." *Id.* at 2779. Accordingly, even if they must evaluate the substantiality of the burden, courts do not ask whether the particular exercise of religion is a substantial part of the plaintiff's faith. *See Haight v. Thompson*, 763 F.3d 554, 566 (6th Cir. 2014) (courts are not "to inquire into the centrality to a faith of certain religious practices—dignifying some, disapproving others").

But the first RFRA element is not unlimited. In addition to being sincere, plaintiffs must allege that the conduct at issue is based on a religious belief, not merely a personal, non-religious belief. *See Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (a challenge "must be sincerely based on a religious belief and not some other motivation")[2]; *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) (a RFRA claim must be based on "a religious belief rather than a philosophy or way of life" (citation omitted)). We rejected a RFRA claim upon finding "ample evidence" that the claimant's belief about marijuana was "primarily a personal one, and to suggest that he was using the [church] as a means of protection from criminal sanctions." *United States v. Barnes*, 677 F. App'x 271, 277 (6th Cir. 2017).[3] Plaintiffs' allegations must also show an actual incompatibility between their religious beliefs and the conduct at issue. *See Robinson v. Jackson*, 615 F. App'x 310, 313 (6th Cir. 2015) (because a meal containing no meat or alcohol qualified as Halal by the inmate's own definition, the prison's provision of vegetarian meals rather than Halal meat was not inconsistent with his religious beliefs as he defined them).

The Complaint alleges that the Plaintiffs have "sincerely held religious beliefs" regarding "what they consider to be religious truth." The Plaintiffs (besides Clayman) allege that among their "religious beliefs" are that they "do not trust in any 'G-d,'" and "their religious ideologies mandate that they act with honesty." The gravamen of the Complaint is that carrying and

---

[2]Although *Holt* involved a claim under RFRA's "sister statute," the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), RLUIPA "mirrors RFRA" and the same standards apply to each. *Id.* at 859–60; *see also Hobby Lobby*, 134 S. Ct. at 2761–62.

[3]*Barnes* considered evidence, not just allegations, because it was considering the denial of the claimant's motion to dismiss a criminal indictment after a hearing at which Barnes had the opportunity to present evidence, rather than considering a grant of a motion to dismiss a civil RFRA claim, as we are here. *Id.* at 275.

transacting with currency containing the words "In God We Trust" is inconsistent with their religious beliefs because, according to Plaintiffs' understanding of their religious beliefs, it causes them to bear, affirm, and proselytize "a religious message that is the antithesis of what they consider to be religious truth." Clayman alleges that he believes that "participation in any activity that ultimately leads to the superfluous printing of G-d's name on secular documents or to the destruction of G-d's printed name is sinful."

Construed in the light most favorable to Plaintiffs, the Complaint alleges that carrying and completing transactions with currency containing the Motto is inconsistent with Plaintiffs' beliefs. Therefore, as long as these views are sincere and religious, the desire of these Plaintiffs to avoid carrying or using currency with the Motto falls within RFRA's broad coverage of "any exercise of religion." Plaintiffs explicitly allege that their beliefs are sincere and religious, and the Government does not dispute those assertions. On a motion to dismiss, we accept the Complaint's allegations as true and decline to question Plaintiffs' allegations that their views are sincerely religious, especially when the Government has not challenged the sincerity or religiosity of Plaintiffs' beliefs.[4] *See Haight*, 763 F.3d at 565–56 (court had no basis for deciding the fact question of sincerity without "a properly developed record (including testimony from the [claimants], reference to religious texts, etc.)").

Plaintiffs contend that carrying currency in violation of their sincere religious beliefs is an exercise of religion within the meaning of RFRA. They allege that they are forced to engage

---

[4]In an amicus curiae brief, the Becket Fund for Religious Liberty argues that the Plaintiffs apart from Clayman are not engaged in an "exercise of religion" because Atheism is a philosophy rather than a religious belief. (The Becket Fund ignores the fact that some Plaintiffs allege that they are Humanists rather than or in addition to being Atheists.) Defendants do not raise this argument, so it need not be resolved here. *Self-Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549, 560 (6th Cir. 2016) (amici "may not raise additional issues or arguments not raised by the parties" (citation omitted)). Regardless, precedent does not support this argument. RFRA's definition of religious exercise is as broad as the Constitution permits. 42 U.S.C. § 2000cc-3(g). In *Hobby Lobby*, Justice Kennedy wrote in concurrence that the right of free exercise includes the right "to establish one's religious (*or nonreligious*) self-definition in the political, civic, and economic life of our larger community." 134 S. Ct. at 2785 (Kennedy, J., concurring) (emphasis added). We have held the same more directly: "The Religion Clauses, it turns out, do protect the religious and nonreligious." *Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 694 (citing *Wallace v. Jaffree*, 472 U.S. 38, 52–54 (1985)). Furthermore, a court's attempt to distinguish between what is or is not a religious belief might implicate the Establishment Clause. *See New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977) (striking down a state provision that would require the state to determine whether classroom examinations involved religious meaning because "[t]he prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment").

in personalized conduct—handling currency—that is inconsistent with their beliefs. Currency is an item an individual owns, carries on his or her person, and uses to engage with the world in a way that is distinct from mere exposure to objectionable speech or ideas. For these reasons, we conclude that Plaintiffs have adequately alleged that they seek to engage in an "exercise of religion" protected by RFRA.

The arguments of the Government and amici to the contrary are not persuasive. The Government argues that the Supreme Court's dictum that the "bearer of currency is . . . not required to publicly advertise the national motto" forecloses Plaintiffs' allegation that the Motto's inscription on currency compels them to bear and proselytize the Motto's message. But Plaintiffs' allegation is a factual one, not a legal one—it alleges that Plaintiffs *believe* that the Motto's presence on the currency forces them to bear and proselytize its message, and that doing so violates their sincere religious beliefs. *See Hobby Lobby*, 134 S. Ct. at 2777–78 (the Court accepted claimants' factual claim that they *believed* that providing insurance might facilitate abortions and thus violate their religious beliefs). The *Wooley* Court's observation that carrying money does not require people to advertise the Motto is irrelevant to Plaintiffs' beliefs that carrying and transacting with currency is inconsistent with their religious views. *Cf. Haight*, 763 F.3d at 567 (the Government "may not use a manual written by government officials to allow other government officials to decide on that basis alone that a practice is not central to this or that faith").

The Government also relies on *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009), to argue that Plaintiffs cannot challenge the Motto's inscription on currency because the Government "is entitled to say what it wishes." Generally that is true, but *Summum* explains that there are nonetheless constraints on government speech. In addition to being limited by the Establishment Clause, "[t]he involvement of public officials in advocacy may be limited by law, regulation, or practice." *Id.* at 468. Stated more directly, "statutory provisions . . . may limit government speech." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2246 (2015). Suffice it to say that we do not accept the argument that the Government's choice of currency inscription can never implicate an exercise of religion protected by RFRA. The Complaint in this case alleges an exercise of religion.

4. Substantial Burden

The Complaint must next allege a substantial burden by the Government on Plaintiffs' religious exercise. The substantial-burden test asks whether the Government is effectively forcing plaintiffs to choose between engaging in conduct that violates sincerely held religious beliefs and facing a serious consequence. *Hobby Lobby*, 134 S. Ct. at 2275–76. In *Hobby Lobby*, the consequence for the corporate plaintiffs was paying "an enormous sum of money"— millions of dollars. *Id.* at 2779. In *Holt*, the consequence for the inmate plaintiff was "serious disciplinary action." 135 S. Ct. at 862. In *O Centro*, the Government conceded that it imposed a substantial burden: The plaintiff's sacramental substance could trigger a criminal prosecution. 546 U.S. at 425. We have stated that the Government substantially burdens an exercise of religion when it "place[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs . . . or effectively bar[s] his sincere faith-based conduct." *Haight*, 763 F.3d at 565 (citations and internal quotation marks omitted).

Unlike in *Hobby Lobby*, *Holt*, and *O Centro*, Plaintiffs do not allege that they are required by law to engage in the conduct they allege violates their religious beliefs (carrying and using currency inscribed with the Motto). The Government argues that this difference dooms Plaintiffs' claims under RFRA. The Government's position finds some support in *Hobby Lobby*, which distinguished two cases that had rejected Free Exercise claims for lack of government coercion. 134 S. Ct. at 2779. In each of those cases, the plaintiffs were "unable to identify any *coercion* directed at the practice or exercise of their religious beliefs." *Id.* (internal quotation marks omitted) (quoting *Tilton v. Richardson*, 403 U.S. 672, 689 (1971) (plurality opinion) (emphasis added) and discussing *Bd. of Ed. v. Allen*, 392 U.S. 236, 249 (1968) ("Appellants have not contended that the New York law in any way *coerces* them as individuals in the practice of their religion." (emphasis added))). But legal penalties are not the only form of coercion that may burden religious exercise. Indeed, Congress invoked *Sherbert v. Verner* in the text of RFRA, *see* 42 U.S.C. § 2000bb(b)(1), a case noting that religious exercise may be substantially burdened through "the denial of or placing of conditions upon a benefit or privilege." 374 U.S. 398, 404 (1963).

Even if a substantial burden for RFRA purposes might exist absent formal legal coercion,[5] a plaintiff would need to allege at least that the Government has placed "substantial pressure on an adherent to modify his behavior." *Haight*, 763 F.3d at 565. We recently addressed what level of governmental pressure constitutes a substantial burden in a RLUIPA case. *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996 (6th Cir. 2017). *Livingston* instructs that the substantial-burden inquiry is a question of law. *Id.* at 1001. The inquiry should be "functional and factually driven." *Id.* at 1011. "[N]ot just any imposition on religious exercise" creates a substantial burden; "a burden must have some degree of severity to be considered 'substantial.'" *Id.* at 1003 (citation omitted). It must be more than a "mere inconvenience." *Id.* at 1009 (quoting *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007)). Unlike the deference to the plaintiff's subjective beliefs in the exercise-of-religion analysis above, *Livingston* conducted an objective analysis of whether the Government had imposed a substantial burden, holding as a matter of law that requiring students to travel an additional 12.1 miles was not a substantial burden, but rather a "mere inconvenience." *See id.* *Livingston* surveyed other circuits and found that courts regularly consider a few factors when determining whether a land-use regulation imposed a substantial burden on a religious institution, including whether the claimant "had a feasible alternative location" and "whether [its] burden was self-imposed." *Id.* at 1004.

Applying *Haight* and *Livingston* to this case, the inscription of the Motto on currency would place sufficiently substantial pressure on Plaintiffs to violate their alleged religious beliefs only if using payment methods other than cash is more than a mere inconvenience, such as if Plaintiffs have no feasible alternative to using cash to engage in necessary transactions. The Complaint includes the necessary allegation, but in a conclusory fashion: "Defendants' acts force Plaintiffs to choose between either relinquishing their rights to participate in much of their everyday commerce (by using the nation's monetary instruments) or violating their religious beliefs." The Plaintiffs can survive a motion to dismiss only if they back up this conclusory

---

[5]As Judge Moore's dissent notes, the Supreme Court has never expressly required a plaintiff to allege formal legal coercion, and this opinion should not be read to impose such a requirement. We instead find that Plaintiffs fail to adequately allege either formal legal coercion or some other kind of pressure to modify their behavior that would, consistent with our circuit's precedent, rise to the level of a substantial burden.

statement with sufficient factual allegations. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014).

The district court concluded, and the Government argues here, that Plaintiffs can often avoid cash by using checks or credit cards. Though access to credit or bank accounts is not universal, not one of the Plaintiffs alleges that his or her financial situation forecloses access to credit or checks. Plaintiffs therefore have not plausibly alleged that they lack a feasible alternative to cash for engaging in commerce.

The district court acknowledged, as does the Government, that some transactions are cash only. Plaintiffs do not allege that they *must* engage in cash-only transactions; rather, they allege merely that they use cash frequently and prefer to do so. For example, one Plaintiff, as an octogenarian, "often feels more comfortable using cash rather than credit cards or checks," while one child Plaintiff "uses money almost every week to buy books, magazines, treats and gifts." Allegations that Plaintiffs prefer to use cash do not show that the Government has effectively forced them to choose between violating their religious beliefs or suffering a serious consequence. Other courts have not held that such issues constitute a substantial burden under RFRA. Rather, they are the type of mere inconveniences that *Livingston* held insufficient to establish a substantial burden. *See Livingston*, 858 F.3d at 1009.

Several Plaintiffs allege that they run small businesses or are self-employed and frequently engage in cash transactions for business, both to make purchases and when customers pay for services. But nowhere does the Complaint allege that any Plaintiffs, including those who are business owners, would suffer serious consequences if they chose to forego handling cash. Many businesses do not accept cash payments, and Plaintiffs have not alleged anything unique about their circumstances that requires them to do so. Avoiding cash might not be ideal for business owners, but that does not mean Plaintiffs have alleged a substantial burden for RFRA purposes. *Id.*

Here, RFRA does not require the Government to permit Plaintiffs to use their preferred means of payment. Even construing the Complaint in the light most favorable to the Plaintiffs and accepting its allegations as true, Plaintiffs have not plausibly alleged that the Government's

inscription of the Motto on U.S. currency substantially burdens their exercise of religion.[6]  We therefore affirm the dismissal of Plaintiffs' RFRA claim.

## B.  Free Exercise

Plaintiffs additionally challenge the Motto's inscription on currency as a violation of the Free Exercise Clause.  In the constitutional context—which is distinct from RFRA claims—only a law that is not neutral or of general applicability "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993).  The Supreme Court has held that "neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment."  *Holt*, 135 S. Ct. at 859 (citing *Emp't Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872, 878–82 (1990)).  A law is not neutral "if the object of [the] law is to infringe upon or restrict practices because of their religious motivation," or if "the purpose of [the] law is the suppression of religion or religious conduct."[7]  *Lukumi*, 508 U.S. at 533.  The parties debate whether the currency statutes are neutral.

Plaintiffs' allegations indicate that at least some legislators who voted to enact the currency statutes intended to promote a Christian monotheistic message.  However, intent to promote one religion is not necessarily intent to suppress another; Plaintiffs' allegations do not show a specific governmental intent to infringe upon, restrict, or suppress other religious beliefs.  Plaintiffs argue that the currency statutes nonetheless effect suppression of Atheist beliefs by requiring the Government to constantly spread speech that is akin to "Atheists Are Wrong."  But the incidental effect of suppression is permissible under the Free Exercise Clause absent restrictive intent:  The laws must have been "enacted because of, not merely in spite of their suppression."  *Lukumi*, 508 U.S. at 541 (citation and internal quotation marks omitted).  True,

---

[6]The Second Circuit reached the same conclusion in a similar case.  *Newdow v. Peterson*, 753 F.3d 105, 109–10 (2d Cir. 2014) (relying on *Wooley* to find that the inscription statutes do not force the bearer of currency to proclaim any viewpoint and thus do not substantially burden religious exercise).

[7]Arguments that inscription of the Motto favors one religion over the other sound in the Establishment Clause, which is not at issue in this case.  *See, e.g., Larson v. Valente*, 456 U.S. 228, 244 (1982).

*Lukumi* held that "subtle departures from neutrality" might constitute evidence of a "covert" intention to suppress religious beliefs.  *Id.* at 534 (citations and internal quotation marks omitted); *see also id.* ("The Free Exercise Clause protects against governmental hostility which is masked, as well as overt."). Unlike in *Lukumi*, however, Plaintiffs here have not alleged that any text of the challenged laws targets a single religion's practice (while exempting others) or that in the months preceding the laws' enactment legislators demonstrated their specific intent to target Plaintiffs themselves.  *Id.* at 535, 541 (for example, the council president of the defendant city asked:  "What can we do to prevent the Church from opening?").  Though these examples from *Lukumi* do not establish a minimum evidentiary requirement to show intent to discriminate, Plaintiffs present nothing close to such evidence of intentional targeting of their religious practices by the currency statutes.

Plaintiffs also argue that the currency statutes are facially discriminatory because the Motto plainly associates the United States with monotheism.  *Lukumi* stated that a "law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context."  508 U.S. at 533.  The Government responds that numerous courts, including the Supreme Court and our circuit sitting en banc, have identified secular purposes of the Motto's inscription on currency in the Establishment Clause context.  Sitting en banc, we held that the Motto "is a symbol of common identity."  *ACLU v. Capitol Square*, 243 F.3d 289, 307 (6th Cir. 2001).  The Tenth Circuit provided a recitation of the secular purposes behind the Motto that other courts have identified:

> The statutes establishing the national motto and directing its reproduction on U.S. currency clearly have a secular purpose.  *Cty. of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 625 (1989) (O'Connor, J., concurring); *Lynch v. Donnelly*, 465 U.S. 668, 692–93 (1984) (O'Connor, J., concurring); *id.* at 716–17 (Brennan, J., dissenting).  The motto symbolizes the historical role of religion in our society, *Lynch*, 465 U.S. at 676, formalizes our medium of exchange, *see O'Hair v. Blumenthal*, 462 F. Supp. 19, 20 (W.D. Tex.), *aff'd sub nom. O'Hair v. Murray*, 588 F.2d 1144 (5th Cir. 1978) (per curiam), *and cert. denied*, 442 U.S. 930 (1979), fosters patriotism, *see Aronow v. United States*, 432 F.2d 242, 243 (9th Cir. 1970), and expresses confidence in the future, *Lynch*, 465 U.S. at 692–93 (O'Connor, J., concurring).

*Gaylor v. United States*, 74 F.3d 214, 216 (10th Cir. 1996) (parallel citations omitted). Although Plaintiffs may disagree with the extent of commonality in the Motto, these cases confirm that the statutes requiring its inscription on the currency are not devoid of secular meaning. The statutes therefore are not facially discriminatory under the Free Exercise Clause.

Because Plaintiffs have not alleged that the currency statutes intended to discriminate against them or suppress their religion, and because caselaw demonstrates that the statutes do not lack any valid secular purpose, the currency statutes are neutral for purposes of the Free Exercise Clause. The statutes are also unquestionably generally applicable. Because neutral and generally applicable laws may incidentally burden religious practices consistent with the First Amendment, we affirm dismissal of Plaintiffs' Free Exercise claims.

## C.  Free Speech

Plaintiffs claim that the Motto's inscription on currency also violates their Free Speech rights by compelling them to convey the Government's speech. As stated above, the Supreme Court has already commented on this exact claim. *See Wooley*, 430 U.S. at 717 n.15.

Under the compelled-speech doctrine, "the First Amendment stringently limits a State's authority to compel a private party to express a view with which the private party disagrees." *Walker*, 135 S. Ct. at 2253. While the Government is generally "entitled to say what it wishes and to select the views that it wants to express," *Summum*, 555 U.S. at 467–68 (citation omitted), it may not do so by forcing a private party to "be an instrument for fostering public adherence to an ideological point of view he finds unacceptable," *Wooley*, 430 U.S. at 715. "[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Id.* at 717.

Despite *Wooley*'s "courier" language, the Government is not uniformly barred from passing laws that might call on private parties to literally *carry* an item containing Government speech. The key analysis is whether the private parties "are closely linked with the expression in a way that makes them appear to endorse the government message." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 565 n.8 (2005) (citation and internal quotation mark omitted) (upholding

compelled subsidies for beef advertising).   In *Johanns*, for example, the Court rejected a compelled speech argument because the record contained no evidence "that individual beef advertisements were attributed to respondents."   *Id.* at 565; *see also id.* at 568 (Thomas, J., concurring) ("The government may not, consistent with the First Amendment, associate individuals or organizations involuntarily with speech by attributing an unwanted message to them.").   *Walker* and *Summum* similarly determined whether speech on optional license plates and privately donated monuments in public parks, respectively, were government speech by assessing whether "persons who observe" these items "routinely—and reasonably—interpret them as conveying some message on the [owner's] behalf."   *Walker*, 135 S. Ct. at 2249 (quoting *Summum*, 555 U.S. at 471).   Therefore, the question in Plaintiffs' compelled-speech claim is whether observers would attribute, or actually have attributed, the Motto on currency to Plaintiffs rather than to the Government.

Plaintiffs' Complaint does not allege that anyone has ever attributed the Motto to them. And the Supreme Court has strongly suggested that the Motto's inscription on currency does not compel speech.   After determining that the Free Speech Clause barred New Hampshire's requirement that its drivers carry a license plate containing the state motto, "Live Free or Die," the Court included the following footnote:

> It has been suggested that today's holding will be read as sanctioning the obliteration of the national motto, "In God We Trust" from United States coins and currency.   That question is not before us today but we note that currency, which is passed from hand to hand, differs in significant respects from an automobile, which is readily associated with its operator.   Currency is generally carried in a purse or pocket and need not be displayed to the public.   The bearer of currency is thus not required to publicly advertise the national motto.

*Wooley*, 430 U.S. at 717 n.15.   This footnote distinguishes between government speech on currency and license plates based on the risk to the carrier of perceived association with the message.   Because Plaintiffs do not allege that the Motto is attributed to them and because the Supreme Court has reasoned that currency is not "readily associated with" its temporary carrier, the district court properly dismissed Plaintiffs' Free Speech claim.   *Id.*

Plaintiffs seek to avoid the attribution analysis by arguing that, just as courts should accept plaintiffs' determinations of what violates their religion, courts should defer to plaintiffs'

determinations about what conduct constitutes support of government speech. But while the Supreme Court has stated that it is not courts' role to question the reasonableness of a plaintiff's religious beliefs, *see Hobby Lobby*, 134 S. Ct. at 2777–79, its caselaw indicates that courts may properly evaluate attribution, *see Walker*, 135 S. Ct. at 2249; *Summum*, 555 U.S. at 471; *Johanns*, 544 U.S. at 565. Accordingly, this argument is unavailing. We thus also affirm the district court's dismissal of the Free Speech claim.

### D. Equal Protection

Finally, Plaintiffs claim that the Government's inscription of the Motto on currency violates the Equal Protection rights of the Fifth and Fourteenth Amendments by stigmatizing those whose religious beliefs do not include trust in God. The district court dismissed the Equal Protection claim by concluding that the currency laws did not treat Plaintiffs differently from similarly situated individuals, noting that the "threshold element of an Equal Protection claim is disparate treatment." Plaintiffs cite *Obergefell v. Hodges*, 135 S. Ct. 2584, 2608 (2015), for the proposition that equal protection includes "equal dignity in the eyes of the law." But, as the district court explained, *Obergefell* concerned laws defining marriage in ways that permitted some classes of persons to engage in conduct that others could not. That is not the case with the currency laws. To the extent Plaintiffs claim that the Motto's inscription on currency "disparately treats [Plaintiffs'] preferred message," we have rejected such an Equal Protection claim, in the context of an Atheist organization challenging a city's refusal to accompany its Christmas display with a sign displaying the organization's proposed message. *Freedom from Religion Found.*, 707 F.3d at 698; *see also Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017) ("[T]he gravamen of an equal protection claim is differential government treatment, not differential government messaging.").

Moreover, Plaintiffs' claim of stigmatic injury has strict standing requirements. Stigmatic injury "accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984) (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014). *Allen* required that plaintiffs identify, beyond the alleged stigmatic injury, "some concrete

interest with respect to which respondents are personally subject to discriminatory treatment," and held that this other interest "must independently satisfy the causation requirement of standing doctrine." *Id.* at 757 n.22. The Court reasoned that without such a concrete, personal interest independently harmed by discriminatory treatment, stigmatic injury claims would have no bounds: "A black person in Hawaii could challenge the grant of a tax exemption to a racially discriminatory school in Maine." *Id.* at 756.

Plaintiffs have alleged facts showing societal bias against Atheists, supporting their claim that they face stigma. They have also alleged facts suggesting that Congress required and reaffirmed the inscription of the Motto on currency for Christian religious purposes. But they have not presented factual allegations plausibly demonstrating that the challenged statutes caused the societal bias that is their asserted injury. *See id.* at 757 n.22 (requiring allegations of personalized injury *caused* by Government discrimination). *Allen* did not fully insulate the Government from liability for derogatory speech, as it recognized that a stigmatizing injury "is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing." *Id.* at 755. As pleaded, however, Plaintiffs' Complaint fails to allege the independent discriminatory treatment *Allen* requires. Plaintiffs therefore do not have standing to bring their Equal Protection claim.

## III. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's dismissal of Plaintiffs' RFRA, Free Exercise, Free Speech, and Equal Protection claims.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting in part.  The national motto, and its inclusion on American money, is of relatively recent vintage.  The first phrase inscribed on American currency was "Mind Your Business"; it appeared on the continental dollar and then on the fugio cent.  William Van Alstyne, *Trends in the Supreme Court:  Mr. Jefferson's Crumbling Wall—A Comment on* Lynch v. Donnelly, 1984 DUKE L.J. 770, 774.  "In God We Trust" did not appear on the currency until the Civil War, when it was imprinted on coins.  B. Jessie Hill, *Of Christmas Trees and Corpus Christi:  Ceremonial Deism and Change in Meaning Over Time*, 59 DUKE L.J. 705, 707–08 (2010).  Congress mandated that the phrase be included on all U.S. coins and bills in 1955, Act of July 11, 1955, Pub. L. No. 84-140 (1955), and subsequently adopted the phrase as the national motto in 1956, Act of July 30, 1956, Pub. L. No. 84-851 (1956).

In their first claim, the plaintiffs argue that the inscription of the national motto "In God We Trust" on U.S. coins and bills substantially burdens their exercise of religion in violation of the Religious Freedom and Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*  All but four of the plaintiffs have sufficiently pleaded factual allegations demonstrating that the inscription substantially burdens their religion and have thus pleaded a plausible violation of RFRA.  I would, therefore, reverse the district court's grant of the government's Rule 12(b)(6) motion to dismiss Claim 1 with respect to these thirty-nine plaintiffs.  Thus, I respectfully dissent from Part II.A.4 of the majority opinion.

**I.**

Congress enacted RFRA "to provide very broad protection for religious liberty."  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014).  The protections provided by the Act extend "beyond what . . . [the Supreme] Court has held is constitutionally required."  *Id.* at 2767; *Holt v. Hobbs*, 135 S. Ct. 853, 859–60 (2015) ("Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment.").

RFRA forbids the federal government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). There is a statutory exception to this prohibition, however. The "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

In order to survive a motion to dismiss, the plaintiffs must sufficiently plead facts alleging that the government is substantially burdening their exercise of religion. *Cf. Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010). But because the government bears the burden of proof to establish that the exception in 42 U.S.C. § 2000bb-1(b) applies, the plaintiffs need not disprove the government's argument that it has a compelling government interest and that its action is the least restrictive means of furthering its compelling interest to state a plausible claim for relief. *Cf. Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006) (rejecting the government's argument that the plaintiff had the burden of disproving the asserted compelling interest at the preliminary-injunction stage). If, however, "the undisputed facts conclusively establish" that the government has a compelling interest and is acting in the least restrictive means of furthering that compelling interest as a matter of law, then "there is no reason not to grant a motion to dismiss." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009); *see also* 5B Charles Alan Wright & Arthur Miller, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed. April 2017 update).

**A.**

I agree with the majority's careful analysis concluding that the plaintiffs have standing to bring their claim. Maj. Op. at 6–7; *see also Newdow v. Lefevre*, 598 F.3d 638, 642–43 (9th Cir. 2010). I also agree that the plaintiffs have sufficiently pleaded the first element of a RFRA claim: that the conduct at issue is an exercise of religion. Maj. Op. at 7–11. As we must accept the complaint's allegations as true on a motion to dismiss, our inquiry into whether the plaintiffs have alleged that they are engaging in an "exercise of religion" protected by RFRA is short. The plaintiffs have alleged that they sincerely hold these religious beliefs. At this stage in the action,

no court reviews the factual sincerity of the plaintiffs' alleged beliefs.  Further, at no point does a court assess the reasonableness of an individual's religious beliefs.  *Hobby Lobby*, 134 S. Ct. at 2778 (stating that RFRA presents the question "whether the HHS mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with *their religious beliefs*" and that federal courts "have no business addressing []whether the religious belief asserted in a RFRA case is reasonable" (emphasis in original)).  Where I depart from the majority's opinion is in its analysis of whether the plaintiffs have sufficiently pleaded a substantial burden on the exercise of their religion.

**B.**

One way in which the government imposes a substantial burden on an individual's exercise of religion is when it creates pressure on that individual to choose between either acting in accordance with her faith or facing a serious consequence.  *Holt*, 135 S. Ct. at 862 (holding that the choice between growing a beard pursuant to the plaintiff's faith or facing "serious disciplinary action" was a substantial burden on the plaintiff's religious exercise[1]); *Hobby Lobby*, 134 S. Ct. at 2779 (holding that the choice between providing insurance coverage in accordance with the plaintiffs' religious beliefs or paying a large fine was a substantial burden); *see also Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 717–18 (1981) ("Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.  While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.").  Recently, we held that "a burden must have some degree of severity to be considered 'substantial.'"  *Livingston Christian Schs. v. Genoa Charter Twp.*,

---

[1]Although the Supreme Court was analyzing the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") in *Holt*, the Court has stated that this is a "sister" act to RFRA and has not drawn a distinction between what constitutes a substantial burden under RFRA and what constitutes a substantial burden under RLUIPA.  135 S. Ct. at 859, 862; *cf. Sossamon v. Texas*, 563 U.S. 277, 281 (2011) ("Section 3 of RLUIPA provides that '[n]o government shall impose a substantial burden on the religious exercise' of an institutionalized person unless, *as in RFRA*, the government demonstrates that the burden 'is in furtherance of a compelling governmental interest' and 'is the least restrictive means of furthering' that interest." (emphasis added)).

858 F.3d 996, 1003 (6th Cir. 2017) (discussing the meaning of "substantial burden" under RLUIPA), *cert. denied*, —— S. Ct. ——, 2018 WL 1994815 (Apr. 30, 2018).

Although a burden must be sufficiently severe in order to be "substantial," it need not arise from formal legal coercion. On its face, RFRA does not limit what constitutes a "substantial burden" to only formal legal coercion. Furthermore, the purpose of the statute is to expand protections for the exercise of religion. 42 U.S.C. § 2000cc-3(g). Any suggestion, therefore, that the plaintiff must allege formal legal coercion in order to assert a RFRA claim is contrary to this purpose as it limits the protections RFRA provides, and the Supreme Court's jurisprudence on this issue has never articulated this requirement.

Rather, there is a substantial burden when there is either de facto or de jure coercion on an individual to choose between violating her religious beliefs or facing serious consequences. *See Hobby Lobby*, 133 S. Ct. at 2783. In this case, the plaintiffs allege that the government's inclusion of the national motto on coins and bills "force[s] Plaintiffs to choose between either relinquishing their rights to participate in much of their everyday commerce (by using the nation's monetary instruments) or violating their religious beliefs." R. 8 (First Amended Complaint ("Compl.") at ¶ 61) (Page ID #254). The Supreme Court has held that "RFRA was enacted to prevent" the government from "effectively exclud[ing] . . . [individuals] from full participation in the economic life of the Nation." *Hobby Lobby*, 133 S. Ct. at 2783. Exclusion from full participation in the economy is exactly what the plaintiffs argue is occurring here. There are transactions that are entirely cash-only (e.g. cash-only businesses, parking meters, tolls, vending machines) and there are individuals whose participation in economic transactions is limited solely to using coins and bills (e.g. children and adults who cannot access credit or bank accounts[2]). If use of coins and bills violates an individual's religious beliefs, then there is a substantial burden if they must use coins and bills in order to participate fully in "the economic life of the Nation."

---

[2]*Cf.* FDIC, 2015 FDIC National Survey of Unbanked and Underbanked Households 1 (2016), https://www.economicinclusion.gov/surveys/2015household/documents/2015_FDIC_Unbanked_HH_Survey_Report.pdf ("In 2015, 7.0 percent of U.S. households were 'unbanked,' meaning that no one in the household had a checking or savings account.").

I agree with the majority that there is no substantial burden on a person's exercise of religion if that individual has only a preference for using cash when conducting economic transactions, but could conduct all the same transactions using an alternative form of payment that does not violate the individual's religious beliefs (e.g. a credit card, debit card, check, etc.). Maj. Op at 12–13; *cf. Livingston Christian Schs.*, 858 F.3d at 1010 (holding that a religious organization was not substantially burdened when it was unable to build a religious school to its specifications on its preferred plot of land when it had adequate alternative facilities that met the organization's needs); *Robinson v. Jackson*, 615 F. App'x 310, 313–14 (6th Cir. 2015) (holding that it was not a substantial burden on a Muslim inmate's exercise of religion when the prison provided only vegetarian meals, as opposed to meals with halal meat, because the vegetarian meals were a viable halal alternative as defined by the inmate's belief system). This is because the foreclosure of a mere preference of payment method, even when that preference is motivated by religious belief, is not severely burdensome if an individual has viable alternatives.[3] *See Livingston Christian Schs.*, 858 F.3d at 1003.

These alternatives must be true alternatives, however, and not additives. *Holt*, 135 S. Ct. at 862 (holding that the district court erred when it concluded that the prisoner's religious exercise was not substantially burdened by the prohibition on him growing a beard because "he had been provided a prayer rug[,] . . . he was allowed to correspond with a religious advisor, and was allowed to maintain the required diet and observe religious holidays"; all of these activities were constituent parts of the prisoner's religious exercise and one could not be substituted for the other); *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) (holding that prisoners' exercise of religion was substantially burdened when they were permitted some, but not all, of the food required to conduct their religious ceremony).

---

[3]Furthermore, mere exposure to the national motto on U.S. coins and bills is not a substantial burden on the plaintiffs' religious exercise. We have previously rejected the argument that "a governmental requirement that a person be exposed to ideas he or she finds objectionable on religious grounds constitutes a burden on the free exercise of the person's religion as forbidden by the First Amendment." *Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058, 1063 (6th Cir. 1987). The same is true under RFRA's substantial-burden standard. The exposure to the national motto on cash does not coerce or pressure the plaintiffs into a choice between their religious exercise or severe consequences, but rather forces them to observe a statement that violates their religious precepts. This burden does not have the requisite degree of severity for it to be substantial.

The plaintiffs' complaint sufficiently alleges a substantial burden on the exercise of their religion. As the majority acknowledges, the complaint includes the necessary allegation that: "Defendants' acts force Plaintiffs to choose between either relinquishing their rights to participate in much of their everyday commerce (by using the nation's monetary instruments) or violating their religious beliefs." R. 8 (Compl. at ¶ 61) (Page ID #254); Maj. Op. at 12–13. I agree with the majority that this statement needs to be supported with sufficient factual allegations in order for the plaintiffs to survive a motion to dismiss. Maj. Op. at 13. I disagree, however, that none of the plaintiffs have satisfied this requirement. Thirty-nine of the forty-three plaintiffs have alleged facts stating that they regularly use coins and bills in order to participate in the economy. R. 8 (Compl. at ¶ 9) (Page ID #228) (New Doe Parent); *id.* at ¶ 10 (Page ID #229) (New Roe Child #1); *id.* at ¶ 11 (Page ID #229) (New Roe Child #2); *id.* at ¶ 12 (Page ID #230) (New Roe Parent); *id.* at ¶ 13 (Page ID #231) (New Poe Child); *id.* at ¶ 14 (Page ID #232) (New Poe Parent); *id.* at ¶ 15 (Page ID #233) (New Coe Child); *id.* at ¶ 17 (Page ID #234) (New Boe Child); *id.* at ¶ 18 (Page ID #234) (New Boe Parent); *id.* at ¶ 19 (Page ID #235) (New Hoe Child #1); *id.* at ¶ 20 (Page ID #235) (New Hoe Child #2); *id.* at ¶ 21 (Page ID #236) (New Hoe Parent #1); *id.* at ¶ 22 (Page ID #237) (New Hoe Parent #2); *id.* at ¶ 23 (Page ID #238) (Holly Huber); *id.* at ¶ 24 (Page ID #239) (Mitchell Kahle); *id.* at ¶ 25 (Page ID #239–40) (Bernard Klein); *id.* at ¶ 26 (Page ID #240) (Marni Huebner-Tiborsky); *id.* at ¶ 27 (Page ID #240) (Loren Miller); *id.* at ¶ 28 (Page ID #241) (Martin Maier); *id.* at ¶ 29 (Page ID #241) (Michael Howard); *id.* at ¶ 30 (Page ID #242) (Larry Knight); *id.* at ¶ 31 (Page ID #243) (Devin Kuchynka); *id.* at ¶ 32 (Page ID #244) (Tracey Martin); *id.* at ¶ 33 (Page ID #244) (Mark Petricca); *id.* at ¶ 34 (Page ID #245) (Beverly Shapiro); *id.* at ¶ 35 (Page ID #245) (Ron Thomas); *id.* at ¶ 36 (Page ID #246) (Derek Rose); *id.* at ¶ 37 (Page ID #246) (George Shiffer); *id.* at ¶ 38 (Page ID #247) (Nancy Dollard); *id.* at ¶ 39 (Page ID #247) (Dennis Rosenblum); *id.* at ¶ 40 (Page ID #248) (Joseph Milon); *id.* at ¶ 41 (Page ID #248) (Salvatore Salerno); *id.* at ¶ 42 (Page ID #248) (Jessica McQuarter); *id.* at ¶ 43 (Page ID #249) (Susan Carrier); *id.* at ¶ 44 (Page ID #250) (Sarah Maxwell); *id.* at ¶ 45 (Page ID #251) (Stuart Chisholm); *id.* at ¶ 46 (Page ID #251) (Michael Martinez); *id.* at ¶ 47 (Page ID #251) (Adam Clayman); *id.* at ¶ 48 (Page ID #252) (Michigan Atheists).[4]

---

[4]In order to plead sufficiently a substantial burden under RFRA (or RLUIPA), we do not require a plaintiff

Non-cash forms of payment are not true alternatives to cash in our economy.  *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1270 (D.C. Cir. 2008) (recognizing that "credit cards do not provide an adequate substitute [for cash] because they have not replaced cash in many daily transactions").  Common sense and our lived experience teaches us that.  *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").  Indeed, the district court, the government, and the majority all acknowledge that numerous transactions in our economy require the use of cash only.  R. 39 (Dist. Ct. Op. at 5) (Page ID #709); Appellees Br. at 23; Maj. Op. at 13.  This is an inescapable factual proposition.  Thus, the thirty-nine plaintiffs who allege that they are required to utilize coins and cash on a regular basis have sufficiently alleged that they face an untenable choice between violating their religious beliefs or being excluded "from *full* participation in the economic life of the Nation," *Hobby Lobby*, 133 S. Ct. at 2783 (emphasis added).  Four of the plaintiffs do not allege that they must use coins and bills, and therefore have not sufficiently pleaded that they face a burdensome dilemma between violating their religion or being excluded from full engagement in the economy.  R. 8 (Compl. at ¶ 7) (Page ID #227) (New Doe Child #1); *id.* at ¶ 8 (New Doe Child #2); *id.* at ¶ 16 (Page ID #233) (New Coe Parent); *id.* at ¶ 49 (Page ID #252) (Northern Ohio Freethought Society).  I thus agree with the majority that these four plaintiffs have not sufficiently pleaded a RFRA claim.  But the remaining thirty-nine plaintiffs have pleaded sufficient facts—which at this stage of the proceedings we must presume to be true—that their full engagement in the economic life of this country requires their handling of bills and coins which violates their sincerely held religious beliefs.

---

to make a particular decision when put to the choice of violating her religious precepts or facing severe consequences; we simply require the plaintiff to allege such an untenable dilemma.  *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2765–66, 2779 (concluding that the plaintiffs had demonstrated they faced substantial burden even though the plaintiffs had not chosen to defy the governmental mandate and pay the fine); *Holt*, 135 S. Ct. at 862 (holding that the plaintiff had shown the prison's grooming policy imposed a substantial burden on his religious exercise without requiring the plaintiff to have grown a beard in violation of the policy and face discipline).  Thus, the plaintiffs need not allege that they have stopped using cash, or have attempted to do so, in order to meet the pleading standards of Rule 8.

**C.**

Because thirty-nine plaintiffs plausibly allege that their exercise of religion is substantially burdened, I now consider whether the government has met its burden establishing that it has a compelling government interest and that displaying the national motto "In God We Trust" on U.S. coins and bills is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000bb-1(b). As articulated in Section I.A, *supra*, because 42 U.S.C. § 2000bb-1(b) places the burden of proof on the government, this exception acts like an affirmative defense. Thus, at this stage of the litigation, a court should grant a motion to dismiss for failure to state a claim only if "the undisputed facts conclusively establish" that the government has a compelling interest and is acting in the least restrictive means of furthering that compelling interest as a matter of law. *Hensley Mfg.*, 579 F.3d at 613; *cf. O Centro*, 546 U.S. at 429.

The government argues that the national motto's "inscription on U.S. coins and currency is central to the public proclamation of the fundamental political values the Motto represents." Appellee Br. at 31. The government claims that its interest in the inscription of the national motto on U.S. coins and bills is compelling because it "is one of the primary means by which Congress communicates, for the benefit of U.S. citizens and to the broader world, the fundamental values on which our system of government is founded." Appellee Br. at 31. The government provides no evidence buttressing its claim about the primacy of the role U.S. coins and bills play in transmitting a message from Congress to U.S. citizens and others.[5] Furthermore, the plaintiffs vigorously contest the validity of the government's assertions.[6]

---

[5]The government may have chosen not to support its argument about the primacy of coins and bills in disseminating its message because the way to do so is to point to evidence about the ubiquity of these objects in our daily lives. This would undercut, however, its argument that the plaintiffs are not substantially burdened by their religious objections to using coins and bills because they can fully engage in the economy without using cash. Appellee Br. at 23–24. The government cannot have its cake and eat it too: as it claims that people can live their lives without handling cash, then its claim that cash is a primary means of communication is without support.

[6]The plaintiffs also argue that there cannot be a compelling interest in utilizing U.S. coins and bills to communicate the values of the American system of government because Congress has mandated the inclusion of "In God We Trust" on coins and bills only since 1955 and this country's monetary system worked effectively prior to that time. Appellant Br. at 33. Similarly, they argue that other countries with functioning monetary systems do not inscribe a motto that references a religious deity on their coins or bills. *Id.* These arguments would be responsive if the compelling interest the government asserted was that the national motto on coins and bills facilitates the use of coins and bills qua coins and bills. The government, however, is not arguing that the money would lose its

Appellant Br. at 33.  Consequently, there are no undisputed facts conclusively establishing that the government has a compelling interest in inscribing "In God We Trust" on U.S. coins and bills.

Even if the government were able to establish such a compelling interest, it has failed to demonstrate that the inscription is the least restrictive means of achieving this compelling interest.  The government argues that the placement of the national motto on U.S. coins and bills is the least restrictive means to further its compelling governmental interest because no other phrase is the national motto.  Appellee Br. at 33.  This argument sidesteps the compelling interest the government has asserted.  The compelling interest, as articulated by the government, is not simply having the national motto inscribed on coins and bills.  Rather, it claims that the compelling governmental interest is having coins and bills function as a "primary means by which Congress communicates . . . the fundamental values on which our system of government is founded."  Appellee Br. at 31.  Thus, the national motto is not the least restrictive means of achieving this alleged compelling interest because Congress could still use coins and bills as such an advertising device without using the specific phrase "In God We Trust" or any other religiously inflected phrase that imposes a substantial burden on users of U.S. coins and bills. *Cf. ACLU of Ohio v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 307–08 (6th Cir. 2001) (en banc) (acknowledging that the national motto does not have an "exclusively secular" purpose).

For example, Congress could effectively promote this nation's values with the motto "E Pluribus Unum," which has been part of the Great Seal of the United States since a committee, including Benjamin Franklin, Thomas Jefferson, and John Adams, first proposed the seal's design in 1782.  GAILLARD HUNT, U.S. DEP'T OF STATE, THE HISTORY OF THE SEAL OF THE UNITED STATES 7, 41 (1909).  The phrase was a familiar refrain during the time of the Founding and represents the union of the former colonies as states in one country. *Id.* at 14.  Thus, "E Pluribus Unum" has arguably a more deeply entrenched historical pedigree than the phrase "In

---

effectiveness as a method of payment without the national motto.  Rather the government is arguing that the national motto is on the currency in order to communicate a message to users of cash.

God We Trust" and it also effectively communicates the fundamental values underpinning this country's government.

Because the government makes unsubstantiated and disputed claims about its compelling interest and narrow tailoring, it has not met the high threshold at the motion-to-dismiss stage for showing that 42 U.S.C. § 2000bb-1(b) applies. *Hensley Mfg.*, 579 F.3d at 613; *cf. O Centro*, 546 U.S. at 429. Consequently, I believe that the district court erred in dismissing the claims of the thirty-nine plaintiffs who sufficiently allege a RFRA claim.

## II.

I agree with the majority that none of the plaintiffs have sufficiently pleaded claims under the First or Fourteenth Amendments and that the district court's dismissal of these claims should be affirmed. But with respect to the plaintiffs' Free Exercise Clause claim, although I agree that 31 U.S.C. §§ 5112(d)(1) and 5114(b) were not enacted with the object of "the suppression of religion," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993), and therefore do not violate the Free Exercise Clause, I do note that our precedent ties us in Gordian knots. The Supreme Court has held that in order for a law to satisfy the Free Exercise Clause it must be neutral. *Id.* at 533. "A law lacks facial neutrality [the minimum requirement of neutrality] if it refers to a religious practice without a secular meaning discernible from the language or context." *Id.* The majority relies on our prior precedent stating, in dicta, that the national motto has a "secular purpose," although not an exclusively secular purpose, to conclude that the inscription of the national motto on bills and coins has a secular meaning.[7] Maj. Op. at 15 (citing *ACLU of Ohio*, 243 F.3d at 307–08). We ought to recognize that this court's assertion that the statement "In God We Trust"—a phrase invoking faith in a supreme, monotheistic

---

[7]There is some slippage here between the requirement that a law contains a secular *meaning* and stating that the law satisfies this requirement because it has a secular *purpose*. I may shout "Oh my God, a bear!" upon encountering such a creature in the woods with my friend. My exclamation does not have a secular meaning: I am invoking the divine in the face of mortal peril. But it does have a secular purpose: I wish to warn my friend of the danger and seek her assistance.

deity[8]—is secular requires some suspension of disbelief.[9]    *See* Hill, *Of Christmas Trees and Corpus Christi*, *supra*, at 724, 745–46, 758, 766–67.

### III.

For the foregoing reasons, I believe that thirty-nine of the plaintiffs have sufficiently pleaded a RFRA violation.    I would therefore reverse the district court's grant of the government's Rule 12(b)(6) motion to dismiss Claim 1 with respect to New Doe Parent, New Roe Child #1, New Roe Child #2, New Roe Parent, New Poe Child, New Poe Parent, New Coe Child, New Boe Child, New Boe Parent, New Hoe Child #1, New Hoe Child #2, New Hoe Parent #1, New Hoe Parent #2, Holly Huber, Mitchell Kahle, Bernard Klein, Marni Huebner-Tiborsky, Loren Miller, Martin Maier, Michael Howard, Larry Knight, Devin Kuchynka, Tracey Martin, Mark Petricca, Beverly Shapiro, Ron Thomas, Derek Rose, George Shiffer, Nancy Dollard, Dennis Rosenblum, Joseph Milon, Salvatore Salerno, Jessica McQuarter, Susan Carrier, Sarah Maxwell, Stuart Chisholm, Michael Martinez, Adam Clayman, and Michigan Atheists. Thus, I respectfully dissent from Part II.A.4 of the majority opinion.

---

[8]"'[I]n God, I have put my trust' (Psalm 56:4, 11); 'Behold, God is my salvation; I will trust' (Isaiah 12:2); 'We trust in the LORD our God' (Isaiah 36:7); '[W]e should not trust in ourselves, but in God which raiseth the dead' (2 Corinthians 1:9); '[W]e trust in the living God' (1 Timothy 4:10); '[N]or trust in uncertain riches, but in the living God' (1 Timothy 6:17); and 'I will put my trust in him' (Hebrews 2:13)." *ACLU of Ohio*, 243 F.3d at 311 (Clay, J., concurring) (alterations in original).

[9]The plaintiffs do not allege an Establishment Clause violation in their complaint, and thus this opinion does not address that Clause.