# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-4440

_____

New Doe Child #1; New Doe Child #2; New Doe Child #3; New Doe Parent; New Roe Child; New Roe Parent; New Boe Child; New Boe Parent; New Poe Child; New Poe Parent; New Coe Child #1; New Coe Child #2; New Coe Child #3; New Coe Parent; Gary Lee Berger; Marie Alena Castle; Charles Daniel Christopher; Patrick Ethen; Betty Gogan; Thomas Gogan; Roger W. Kaye; Charlotte Leverette; Dr. James B. Lyttle; Kyle Pettersen-Scott; Odin Smith; Andrea Dawn Sampson; Eric Wells; Atheists for Human Rights (AFHR); Saline Atheist & Skeptic Society

*Plaintiffs - Appellants*

v.

The United States of America; Steven T. Mnuchin,[1] Secretary of the Treasury; David J. Ryder,[2] Director, United States Mint; Leonard R. Olijar, Director, Bureau of Engraving and Printing

*Defendants - Appellees*

------------------------------

The Becket Fund for Religious Liberty

*Amicus on Behalf of Appellee(s)*

_____

---

[1]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Steven T. Mnuchin has been automatically substituted as a party.

[2]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), David J. Ryder has been automatically substituted as a party.

Appeal from United States District Court
for the District of Minnesota - Minneapolis

Submitted: March 13, 2018
Filed: August 28, 2018
_____

Before GRUENDER, BEAM, and KELLY, Circuit Judges.
_____

GRUENDER, Circuit Judge.

This case presents a challenge to the inscription of the national motto, "In God We Trust," on United States coins and currency. The Plaintiffs are twenty-seven individuals who are atheists or children of atheists and two atheist organizations who "definitely do not trust in God." They brought this action against the United States and officials from the United States Mint, Treasury, and Bureau of Engraving and Printing (collectively "the Government"), raising various constitutional and statutory challenges. In the complaint, the Plaintiffs allege that the statutes requiring the inscription of the national motto on U.S. coins and currency, 31 U.S.C. §§ 5112(d)(1) & 5114(b), violate the Establishment Clause, the Free Speech Clause, and the Free Exercise Clause of the First Amendment; the Religious Freedom Restoration Act ("RFRA"); and the Equal Protection component of the Fifth Amendment. They seek declaratory relief and a permanent injunction barring the Government from minting coins or printing currency with the phrase "In God We Trust." The Government filed a motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the action for failure to state a claim, which the district court[3] granted. Plaintiffs timely appealed.

_____

[3]The Honorable Wilhelmina M. Wright, United States District Judge for the District of Minnesota.

Having satisfied ourselves that we have jurisdiction to hear each challenge, *see Nolles v. State Comm. for Reorganization of Sch. Dists.*, 524 F.3d 892, 897 (8th Cir. 2008), we now review *de novo* the district court's grant of the motion to dismiss, *see Wong v. Minn. Dep't of Human Servs.*, 820 F.3d 922, 927 (8th Cir. 2016). We address each challenge in turn, and we affirm.

## I.

### A.

The Establishment Clause prohibits Congress from making any law "respecting an establishment of religion." U.S. Const. amend. I. Plaintiffs argue that placing the motto "In God We Trust" on coins and currency violates the Establishment Clause because "the text is purely religious." In their view, the motto is an explicit endorsement of Christianity and monotheism, with the purpose and effect of spreading that faith and coercing non-believers to participate in religious acts. Thus, the Plaintiffs claim, the motto's continued use on U.S. money constitutes "an actual establishment of religion" under "every test enunciated by the Supreme Court."

We note at the outset that each of our sister circuits to have considered the question has found that placing "In God We Trust" on U.S. coins and currency does not violate the Establishment Clause. *See Mayle v. United States*, 891 F.3d 680, 684-86 (7th Cir. 2018); *Newdow v. Peterson*, 753 F.3d 105, 108 (2d Cir. 2014) (per curiam); *Newdow v. Lefevre*, 598 F.3d 638, 645 (9th Cir. 2010); *Gaylor v. United States*, 74 F.3d 214, 217-18 (10th Cir. 1996); *O'Hair v. Murray*, 588 F.2d 1144, 1144 (5th Cir. 1979) (per curiam); *Kidd v. Obama*, 387 F. App'x 2 (D.C. Cir. 2010) (per curiam). In *dicta*, the Supreme Court has repeatedly suggested the same.[4] *See, e.g.*,

---

[4]While undoubtedly important to our analysis, Supreme Court *dicta* does not dictate the outcome of this case. This court, sitting *en banc*, recently clarified the role of Supreme Court *dicta* in our decisionmaking: "Although panels have held that federal courts are 'bound' by Supreme Court dicta, this goes too far. Appellate courts should afford deference and respect to Supreme Court dicta, particularly where, as

*Lynch v. Donnelly*, 465 U.S. 668, 676 (1984); *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 602-03 (1989).  Thus, we are not writing on a blank slate.

We do, however, address this issue for the first time today under the guidance of new Supreme Court precedent, not yet considered in this circuit.  *See Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014).  Over the last half century, the Supreme Court has adopted numerous tests to interpret the Establishment Clause, without committing to any one.  *See Lynch*, 465 U.S. at 678-79; *see also Van Orden v. Perry*, 545 U.S. 677, 692 (2005) (Scalia, J., concurring).  Its most recent direction[5] came in *Town of Greece v. Galloway*.  As we have noted, in particularly complex and changing areas of the law, the "prudent course for an inferior court . . . is to hew closely to the Court's specific, contemporary guidance." *S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 809 (8th Cir. 2013).  Thus, we analyze *Galloway* with particular care.

In *Galloway*, the Supreme Court offered an unequivocal directive:  "[T]he Establishment Clause *must* be interpreted by reference to historical practices and understandings."  134 S. Ct. at 1819 (internal quotation marks omitted) (emphasis added).  The Court adopted the principle that the "line we must draw between the permissible and the impermissible is one which accords with history and faithfully

---

here, it is consistent with longstanding Supreme Court precedent." *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064 (8th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 647 (2018).  Thus, like our sister circuits, we respectfully consider the Supreme Court's statements on this issue, but we do not stop our analysis there. *See, e.g.*, *Mayle*, 891 F.3d at 684-86.

[5]The Court addressed an Establishment Clause challenge in *Trump v. Hawaii*, but expressly noted that the case was atypical.  138 S. Ct. 2392, 2418, 2420 & n.5 (2018).

reflects the understanding of the Founding Fathers."[6]  *Id.* (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 294 (1963) (Brennan, J., concurring)). *Galloway* involved a challenge to a town's practice of opening its board meetings with a prayer that often contained sectarian language.  *See id.* at 1815-17.  In upholding the practice, the Court first looked to historical practices as evidence that the town's prayer was permitted by the Establishment Clause.  *Id.* at 1818-24.  A majority of the Court then considered whether the prayer at issue was unduly coercive, again tying the prohibition against Government coercion of religion to history.  *See id.* at 1825 (plurality opinion) (conducting a coercion analysis "against the backdrop of historical practice"); *id.* at 1837 (Thomas, J., concurring in part and concurring in the judgment) (looking at the kind of coercion that was "a hallmark of historical establishments of religion").  This two-fold analysis is complementary: historical practices often reveal what the Establishment Clause was originally understood to permit, while attention to coercion highlights what it has long been understood to prohibit.

Some have read *Galloway* as "a major doctrinal shift" in Establishment Clause jurisprudence.  *See Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 602 (6th Cir. 2015) (Batchelder, J., concurring in part and concurring in the result); *see*

_____

[6]The Court explained that it was applying the historically focused "rationale" set out in *Marsh v. Chambers*, 463 U.S. 783 (1983), a case involving legislative prayer.  *See Galloway*, 134 S. Ct. at 1824, 1818-19.  In the past, *Marsh* had sometimes been "described as carving out an exception to the Court's Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to any of the formal 'tests' that have traditionally structured this inquiry." *Id.* at 1818 (internal quotation marks omitted).  In *Galloway*, however, the Court clarified that "*Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation.  The case teaches instead that the Establishment Clause must be interpreted by reference to historical practices and understandings."  *Id.* at 1819 (internal quotation marks omitted).

*also Felix v. City of Bloomfield*, 847 F.3d 1214, 1219 (10th Cir. 2017) (Kelly, J., dissenting from the denial of rehearing en banc). Given (1) *Galloway*'s unqualified directive that the Establishment Clause "must" be interpreted according to historical practices and understandings, 134 S. Ct. at 1819; (2) its emphasis that this historical approach is not limited to a particular factual context, *id.* at 1818-19; and (3) the absence of any reference to other tests in the Court's opinion, we agree.[7]

To be sure, the precise implications of this shift are not yet clear.[8] What is clear, however, is that *Galloway* provides the framework for analyzing this case. In the past, this court's approach to Establishment Clause jurisprudence has been to

---

[7]Though the concurring opinion maintains that "history alone cannot carry the day" where the Court's other Establishment Clause tests suggest that a practice is unconstitutional, *Galloway* states otherwise: "*Any* test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Id.* at 1819 (emphasis added). Indeed, the Court emphasized "that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted." *Id.* The Court reasoned that a "test that would sweep away what has so long been settled would create new controversy and begin anew the very divisions along religious lines that the Establishment Clause seeks to prevent." *Id.*

[8]We find *Galloway*'s emphasis on historical understanding difficult to reconcile with some of the Supreme Court's earlier pronouncements on the Establishment Clause. But, as a lower court, and whatever the bounds of *Galloway*, we will continue to apply the Court's earlier tests when directly applicable. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *cf. Red River Freethinkers v. City of Fargo*, 764 F.3d 948, 949 (8th Cir. 2014) (noting that because the monument at issue in the case "is essentially the same as those in *Van Orden v. Perry*," it should "be evaluated under the standard in *Van Orden v. Perry*").

analyze the case before us under the most analogous Supreme Court decision.[9]  *See, e.g.*, *ACLU Neb. Found. v. City of Plattsmouth*, 419 F.3d 772, 778 n.8 (8th Cir. 2005) (en banc) (applying one test to the exclusion of others when analyzing the constitutionality of a Ten Commandments monument); *Jackson v. Nixon*, 747 F.3d 537, 541-42 (8th Cir. 2014) (same when analyzing a prison policy that conditioned benefits on attendance at a nonsecular substance abuse treatment program); *Roark v. S. Iron R-1 Sch. Dist.*, 573 F.3d 556, 563 & n.4 (8th Cir. 2009) (same when analyzing the distribution of religious literature to school children).  Here, *Galloway* is best suited to the challenge before us because both the prayer at issue in that case and the inscription of the national motto at issue here represent Government acknowledgments of religion that "strive for the idea that people of many faiths may be united in a community of tolerance and devotion."  *See Galloway*, 134 S. Ct. at 1823.  Factually, this case falls within *Galloway*'s ambit.

We will therefore analyze the Plaintiffs' Establishment Clause claim under *Galloway* and ask two questions.  First, what do historical practices indicate about the constitutionality of placing the national motto on money?  Second, is the motto impermissibly coercive?

B.

We begin by looking to historical practices.  Where "history shows that the specific practice is permitted," we typically need go no further; the Establishment Clause claim fails.  *Galloway*, 134 S. Ct. at 1819; *see also id.* at 1834 (Alito, J., concurring).  But where history has not spoken to the "specific practice" at hand, *Galloway* indicates that we look to the historical understandings of the Establishment Clause as informed by other relevant practices.  *Id.* at 1819 (majority opinion).

---

[9]This approach differs from that of courts that attempt to consider all—even sometimes conflicting—tests in a single case.  *See, e.g.*, *Smith*, 788 F.3d at 586-87 (majority opinion) (applying "three main jurisprudential threads"); *Mayle*, 891 F.3d at 684-87 (applying at least three distinct Establishment Clause tests).

The Plaintiffs—and the concurring opinion—rightly note that the specific practice of placing "In God We Trust" on U.S. money did not begin until 1864 and was not uniform across all currency until almost a century later. But the practice comports with early understandings of the Establishment Clause as illuminated by the actions of the First Congress. The Supreme Court has long recognized the "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch*, 465 U.S. at 674. For example, "[t]he First Congress made it an early item of business to appoint and pay official chaplains, and both the House and Senate have maintained the office virtually uninterrupted since that time." *Galloway*, 134 S. Ct. at 1818. Likewise, the "day after the First Amendment was proposed, Congress urged President Washington to proclaim a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts, the many and signal favours of Almighty God." *Lynch*, 465 U.S. at 675 n.2 (internal quotation marks omitted). "The same Congress also reenacted the Northwest Territory Ordinance of 1787, 1 Stat. 50, Article III of which provided: 'Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.'" *McCreary Cty. v. ACLU*, 545 U.S. 844, 887 (2005) (Scalia, J., dissenting). These practices and others shed light on the historical understandings of religion's role in American life. As the Supreme Court has noted, "the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him." *See Schempp*, 374 U.S. at 213; *cf.* The Declaration of Independence para. 2 (U.S. 1776) ("We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights . . . ."). Thus, given that our founding documents protect rights that were thought to derive from God, it is unsurprising that "religion has been closely identified with our history and government," a relationship still "evidenced today in our public life." *Schempp*, 374 U.S. at 212-13; *see also Galloway*, 134 S. Ct. at 1819.

Despite this unbroken history, the Plaintiffs emphasize that the national motto is, on its face, monotheistic and was originally inscribed on currency with an "intention to suffuse our nation with (Christian) Monotheistic religion," as revealed by the statements of various public officials and other evidence. They therefore assert that inscribing coins and currency with the motto violates the Establishment Clause because it (1) privileges monotheism and (2) was impermissibly motivated by a desire to advance that religion.

These contentions fail to state a claim under the Establishment Clause. First, although the motto refers to one God, historical practices confirm that the Establishment Clause does not require courts to purge the Government of all religious reflection or to "evince a hostility to religion by disabling the government from in some ways recognizing our religious heritage." *City of Plattsmouth*, 419 F.3d at 778. Precluding general references to God would do exactly that. In *Galloway*, the Court communicated the same idea when rejecting the challenge to sectarian prayer. 134 S. Ct. at 1822 (suggesting that because "even seemingly general references to God or the Father might alienate nonbelievers or polytheists," that is evidently not the line drawn by the Constitution). In doing so, it cited Justice Scalia's dissent in *McCreary County v. ACLU*, *see id.*, which explained that "[i]f religion in the public forum had to be entirely nondenominational, there could be no religion in the public forum at all," 545 U.S. at 893 (Scalia, J., dissenting); *see also Mayle*, 891 F.3d at 687 (rejecting a similar challenge to the placement of the national motto on money "not because we think that the phrase 'In God We Trust' is absolutely devoid of religious significance, but instead because the religious content that it carries does not go beyond statutory or constitutional boundaries"). As the Supreme Court has proclaimed time and again, our "unbroken history" is replete with these kinds of official acknowledgments, *see Lynch*, 465 U.S. at 674, which "demonstrate that there is a distance between the acknowledgment of a single Creator and the establishment

of a religion." *McCreary Cty.*, 545 U.S. at 893 (Scalia, J., dissenting).[10] A theory that erases that distance necessarily fails.

Second, the Plaintiffs' contention that the stated motivations and purposes for placing "In God We Trust" on coins and currency somehow transform an otherwise constitutional practice into an unconstitutional establishment of religion also fails. We agree with the Seventh Circuit that this argument is "too simplistic." *See Mayle*, 891 F.3d at 685. The Constitution does not prevent the Government from promoting and "celebrat[ing] our tradition of religious freedom," even if the means of doing so—here, adding the national motto to U.S. money—was motivated "in part because of religious sentiment." *Id.* at 685-86. Placing "In God We Trust" on coins and currency is consistent with historical practices.

## C.

We now consider whether the appearance of "In God We Trust" on U.S. money is coercive. "It is an elemental First Amendment principle that government may not coerce its citizens to support or participate in any religion or its exercise." *Galloway*, 134 S. Ct. at 1825 (plurality opinion) (internal quotation marks omitted). Here, the Plaintiffs argue that they are continually confronted with and coerced into proselytizing a religious idea they oppose.

---

[10]Plaintiffs point out that "the individual freedom of conscience protected by the First Amendment" applies equally to "the conscience of the infidel, the atheist, or the adherent of a non-Christian faith" and "embraces the right to select any religious faith or none at all." *See Wallace v. Jaffree*, 472 U.S. 38, 52-53 (1985). This proposition is consistent with our decision today. *See McCreary Cty*., 545 U.S. at 893 (Scalia, J., dissenting) ("That [principle of not favoring one religion over another is] valid . . . where public aid or assistance to religion is concerned, or where the free exercise of religion is at issue, but it necessarily applies in a more limited sense to public acknowledgment of the Creator." (citations omitted)).

We need not probe the bounds of the coercion analysis in this case because it is even more apparent than in *Galloway* that the Government does not compel citizens to engage in a religious observance when it places the national motto on money. *See Mayle*, 891 F.3d at 685 ("[I]f, as the Supreme Court has held, public or legislative prayer does not force religious practice on an audience, it is difficult to see how the unobtrusive appearance of the national motto on the coinage and paper money could amount to coerced participation in a religious practice." (citation omitted)). In *Galloway*, the respondents argued that they felt pressured to participate in the opening prayers at town meetings to curry favorable rulings from board members. 134 S. Ct. at 1825 (plurality opinion). The plurality explained that a "reasonable observer" would understand that by opening board meetings in prayer, the town was not proselytizing or "forc[ing] truant constituents into the pews"; it was not "compel[ling] its citizens to engage in a religious observance." *Id.* The Justices disagreed regarding the scope of the appropriate coercion analysis, but a majority agreed that "[o]ffense . . . does not equate to coercion" because "[a]dults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views . . . ." *Id.* at 1826; *id.* at 1838 (Thomas, J., concurring in part and concurring in the judgment).

Here, we recognize that convenience may lead some Plaintiffs to carry cash, but nothing compels them to assert their trust in God. Certainly no "reasonable observer" would think that the Government is attempting to force citizens to express trust in God with every monetary transaction. *See id.* at 1825 (plurality opinion); *Mayle*, 891 F.3d at 685. Indeed, the core of the Plaintiffs' argument is that they are continually confronted with "what they feel is an offensive religious message." But *Galloway* makes clear that "[o]ffense . . . does not equate to coercion." 134 S. Ct. at 1826 (plurality opinion).

In sum, the Plaintiffs' Establishment Clause challenge in this case flouts *Galloway*'s caution that "Government may not mandate a civic religion that stifles any but the most generic reference to the sacred any more than it may prescribe a religious orthodoxy." *Id.* at 1822 (majority opinion); *see also Lee v. Wiseman*, 505 U.S. 577, 598 (1992) ("A relentless and all-pervasive attempt to exclude religion . . . could itself become inconsistent with the Constitution."); *Bormuth v. Cty. of Jackson*, 870 F.3d 494, 522 (6th Cir. 2017) (en banc) (Sutton, J., concurring) ("All references to any one faith or to religion in general, [the plaintiff] says, must be removed from governmental proceedings. Who is coercing whom under that approach? And what are we establishing?"). Because the long tradition of placing "In God We Trust" on U.S. money comports with the original understanding of the Establishment Clause, the Plaintiffs' claim fails.

## II.

We next turn to the Plaintiffs' claim that inscribing the national motto on currency violates the Free Speech Clause because it compels them "to bear and proselytize what they feel is an offensive religious message." In *Wooley v. Maryland*, the Supreme Court explained that "the State's interest . . . to disseminate an ideology . . . cannot outweigh an individual's First Amendment right to avoid becoming the courier for such a message." 430 U.S. 705, 717 (1977). Applying this principle, the Court found that New Hampshire could not require its citizens to display publicly the words "Live Free or Die" on their license plates. *Id.* Here, the Plaintiffs argue that, like the citizens of New Hampshire, they are required to act as couriers of the Government's professed trust in God.

But *Wooley* itself forecloses this argument. In *Wooley*, the Supreme Court assuaged the concern that its holding would implicate the inscription of the motto on currency by highlighting the many differences between currency and license plates. *Id.* at 717 n.15. It explained that currency "differs in significant respects from an

automobile, which is readily associated with its operator. Currency is generally carried in a purse or pocket and need not be displayed to the public. The bearer of currency is thus not required to publicly advertise the national motto." *Id.*

Looking to *Wooley*, we agree with our sister circuits that the use or possession of U.S. money does not require a person to express, adopt, or risk association with any particular viewpoint. *See Mayle*, 891 F.3d at 686; *New Doe Child #1 v. Congress of the U.S.*, 891 F.3d 578, 593-94 (6th Cir. 2018). The nature of currency is such that any expression thereon is distinctively the Government's own. *Mayle*, 891 F.3d at 686 (explaining that if a person involved in a commercial transaction "thought about it at all, she would understand that the government designed the currency and is responsible for all of its content, including the motto," and "[s]he would not regard the motto as [an individual's] own speech"). The Government's inscription of "In God We Trust" on coins and currency does not compel the Plaintiffs to express any message. Therefore, the Plaintiffs fail to state a claim under the Free Speech Clause.

## III.

The Plaintiffs also argue that including the motto on money violates their First Amendment rights under the Free Exercise Clause and statutory rights under RFRA by forcing them to affirm and spread a religious message with which they disagree.

### A.

The Free Exercise Clause requires only that the statutes at issue be neutral and generally applicable; incidental burdens on religion are usually not enough to make out a free exercise claim. *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015). A law is not neutral, however, if its object or purpose is the "suppression of religion or religious conduct." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). Here, nothing in the text of the statutes requiring the inscription of the motto on U.S. coins and currency purports to burden anyone on the basis of religious

-13-

belief. Nor is there any indication that the statutes were designed to impose such burdens. Thus, the statutes are neutral and generally applicable, and the Plaintiffs fail to state a claim under the Free Exercise Clause. *See Mayle*, 891 F.3d at 686; *New Doe Child #1*, 891 F.3d at 592-93; *Peterson*, 753 F.3d at 109-10.

B.

By its terms, RFRA offers greater protection than the Free Exercise Clause. It provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability."[11] 42 U.S.C. § 2000bb-1(a). If a party demonstrates that the Government has substantially burdened the exercise of his or her religion, "under the Act that person is entitled to an exemption from the rule unless the Government 'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761 (2014) (quoting 42 U.S.C. § 2000bb-1(b)).

The Plaintiffs claim that they are "forced against their will to perform [a] religiously offensive act" because they must either "bear[] and proselytiz[e] a message that is the antithesis of the central claim of their religious ideology" or forego "full participation in the economic life of the nation." Citing *Hobby Lobby*, 134 S. Ct. at 2783, they argue that this choice—created by the statutes requiring the inscription of the national motto on money—places a substantial burden on the

---

[11]Although in an *amicus curiae* brief the Becket Fund for Religious Liberty argues that atheists cannot assert a substantial burden on the free exercise of "religion" under RFRA, the Government does not contest the Plaintiffs' general ability to raise a claim under that statute. Thus, for the purposes of this appeal, we assume without deciding that the Plaintiffs are engaged in an exercise of "religion." *See Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 826-27 n.6 (8th Cir. 2009) (declining to consider an argument raised by *amici* but not by the parties to the case).

exercise of their beliefs.  Moreover, the Plaintiffs argue that the Government has no interest, let alone a compelling interest, in including the phrase on money.

We do not question the reasonableness of the Plaintiffs' belief that carrying and using cash emblazoned with the words "In God We Trust" violates their convictions,[12] nor do we have reason to doubt the sincerity of those beliefs.  *See Hobby Lobby*, 134 S. Ct. at 2778-79 ("[I]t is not for us to say that [the plaintiffs] religious beliefs are mistaken or insubstantial.  Instead, our narrow function in this context is to determine whether the line drawn reflects an honest conviction." (internal quotation marks and alteration omitted)).  Thus, we begin our analysis by considering whether the Government has placed a substantial burden on the Plaintiffs' exercise of religion.

A substantial burden exists when the Government forces a person to act, or refrain from acting, in violation of his or her religious beliefs, by threatening sanctions, punishment, or denial of an important benefit as a consequence for noncompliance.  *See Hobby Lobby*, 134 S. Ct. at 2775-79; *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717-18 (1981); *see also Priests for Life v. U.S. Dept. of HHS*, 808 F.3d 1, 17 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from the denial of rehearing en banc) ( "In most religious liberty cases, the Government has said in essence:  'Do X or suffer a penalty,'" and the "religious objector responds that X violates his or her religious beliefs.").  The substantial-burden requirement of RFRA is satisfied if the "penalty" suffered for not complying with the required conduct is so severe as to "put[] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 717-18.

_____

[12]Importantly, we are not suggesting that, as a general matter, carrying money with these words is a coercive religious act or that people using money express or condone any kind of religious message. *See Mayle*, 891 F.3d at 686-87; *ante* Sections I & II.  Instead, in the RFRA analysis, we credit what the Plaintiffs *believe* to be true. *See New Doe Child #1*, 891 F.3d at 588.

At the outset, we note that the challenged statutes do not direct the Plaintiffs to *do* anything. The statutes read: "United States coins shall have the inscription 'In God We Trust,'" 31 U.S.C. § 5112(d)(1), and "United States currency has the inscription 'In God We Trust' in a place the Secretary decides is appropriate," *id.* § 5114(b). Because the statutes do not govern private conduct, it is not clear that the Plaintiffs have alleged a substantial burden under RFRA, let alone one that could be redressed through an exemption or accommodation. *See Hobby Lobby*, 134 S. Ct. at 2761. But even if we construe the statutes as imposing a kind of implicit directive that individuals carry money, all circuits to have considered the issue have found that the consequence of "noncompliance" is not substantial. *See Mayle*, 891 F.3d at 686-87; *New Doe Child #1*, 891 F.3d at 590-91; *Peterson*, 753 F.3d at 109; *see also Lefevre*, 598 F.3d at 645-46. Here, the complaint alleges that the cost of the Plaintiffs' adherence to their religious convictions is "relinquishing the convenience of carrying the nation's money." While cash may be a convenient means of participating in the economy, there are many alternatives that would not violate the Plaintiffs' stated beliefs. *Cf. Ohio v. American Express*, 138 S. Ct. 2274, 2280 (2018) ("Credit cards have become a primary way that consumers in the United States purchase goods and services."). We are aware of no case that has found a substantial burden on similar facts, and we have often held that not all burdens constitute substantial burdens. *See, e.g.*, *Weir v. Nix*, 114 F.3d 817, 820-22 (8th Cir. 1997). Indeed, the Sixth Circuit recently rejected a parallel RFRA challenge to the motto, finding that the "mere inconvenience" of relying on the many alternatives to cash does not rise to the level of a substantial burden. *See New Doe Child #1*, 891 F.3d at 590.

In their briefing before this court, the Plaintiffs highlight various cash-only situations they may encounter and also point out that some alternatives to cash, like checks and credit cards, are not available to the child-Plaintiffs. We recognize that, in limited circumstances, there may not be a viable cash alternative. But the complaint does not allege that the Plaintiffs are unable to make necessary or even

-16-

regular purchases, and we do not think that difficulty buying "a popsicle from the neighborhood ice cream truck" or using a coin-operated laundry machine is what the Supreme Court had in mind when it said that RFRA protects against the denial of "full participation in the economic life of the Nation." *See Hobby Lobby*, 134 S. Ct. at 2775-76, 2779, 2783. Indeed, here, the alleged consequences are different in kind from the consequences that the Supreme Court has found to create substantial burdens on the exercise of religion. *See id.* at 2779 (violating a mandate to arrange for contraceptive coverage would result in an "enormous" fine, as much as $475 million per year); *Holt*, 135 S. Ct. at 862 (contravening a policy that requires prisoners to shave their beards would result in "serious disciplinary action"); *O Centro*, 546 U.S. at 425 (violating a statute that imposes an outright ban on the importation and use of listed substances would result in criminal prosecution); *see also Sherbert v. Verner*, 374 U.S. 398, 399-401 (1963) (violating a requirement that a person accept available work on the Sabbath would make the individual categorically ineligible for unemployment benefits). Although we do not discount the possibility that even minor consequences levied by the Government, such as a relatively small fine, could constitute a substantial burden, here the asserted burdens are negligible, often avoidable, and not directly compelled by the statutes at issue.

Because the Plaintiffs have failed to allege a substantial burden, we need not proceed further with the RFRA analysis. The Plaintiffs' RFRA claim fails.

## IV.

Finally, the Plaintiffs allege that the statutes requiring the inscription of the national motto on U.S. coins and currency violate the Equal Protection component of the Fifth Amendment by marginalizing atheists. The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1, and it applies to the federal government through the Due Process Clause of the Fifth

Amendment, *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). The Equal Protection Clause demands that similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Unless a law burdens a fundamental right, targets a suspect class, or has a disparate impact on a protected class and was motivated by a discriminatory intent, we apply rational basis scrutiny to the challenged law. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Knapp v. Hanson*, 183 F.3d 786, 789 (8th Cir. 1999).

Here, by requiring the inscription of "In God We Trust" on U.S. coins and currency, the statutes do not create any express or implied classifications. Rather they apply equally to all individuals. And even assuming disparate impact, we have already determined that there is no evidence suggesting that the inclusion of the motto on U.S. coins and currency was motivated by a desire to discriminate against atheists. Rather, we find that placing the motto on money is rationally related to the Government's legitimate goal of honoring religion's role in American life and in the protection of fundamental rights. *See, e.g.*, S. Con. Res. 96, 109th Cong. (2006). Thus, the Plaintiffs' equal protection claim fails. *See Mayle*, 891 F.3d at 687; *New Doe Child #1*, 891 F.3d at 594-95.

## V.

For the foregoing reasons, we affirm the judgment of the district court.[13]

---

[13]We deny as moot the Plaintiffs' renewed motion to compel.

-18-

KELLY, Circuit Judge, concurring in part, and concurring in the judgment.

I join the court's opinion except as to the Establishment Clause claim. That portion of the opinion, in my view, seeks to remake Establishment Clause jurisprudence in this circuit based on analysis that is overly broad and unnecessary to the resolution of this case. I nonetheless concur in the judgment because the Supreme Court has already all but determined that the motto's placement on our national currency does not offend the Establishment Clause.

The court—citing a concurring and a dissenting opinion from two other circuits—determines that Town of Greece v. Galloway, 134 S. Ct. 1811 (2014), is "a major doctrinal shift in Establishment Clause jurisprudence." Supra at 5 (cleaned up). But Galloway does not read like a sea change; it reads like a clarification. Galloway clarifies that the Establishment Clause is to be interpreted "by reference to historical practices and understandings." Galloway, 134 S. Ct. at 1819 (cleaned up). But it also clarifies that Supreme Court precedent "must not be understood as permitting a practice that *would amount to a constitutional violation* if not for its historical foundation." Id. (emphasis added). In other words, even when history indicates that a practice does not offend the Establishment Clause, but the Court's other Establishment Clause tests suggest that it does, history alone cannot carry the day. Instead, "[a]ny test . . . must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." Id. at 1819. Thus, Galloway itself does not support this court's suggestion, supra at 4–7, that history is now the single most important criterion when evaluating Establishment Clause claims.

And, even if Galloway does make history a prime part of our Establishment Clause analysis, it does not make clear *what* history we should consider in this case. In Galloway, it was the Framers that mattered. See Galloway, 134 S. Ct. at 1819 (noting that "[a]ny test the Court adopts must acknowledge a practice that was

accepted by the *Framers*" (emphasis added)); id. at 1818–19 (recounting how the fact that "the First Congress provided for the appointment of chaplains only days after approving language for the First Amendment demonstrates that the Framers considered legislative prayer a benign acknowledgment of religion's role in society"); id. at 1820 (noting that "[t]he Congress that drafted the First Amendment would have been accustomed to invocations containing explicitly religious themes"); id. at 1823–24 (citing a letter from John Adams to his wife, Abigail, and discussing how "[f]rom the earliest days of the Nation" legislative prayers "have been addressed to assemblies comprising many different creeds"). This focus on the Framers makes sense because, as the Court explained, practices approved of by the same people who wrote and ratified the First Amendment, and which have survived since ratification, likely do not offend the Establishment Clause. See id. at 1819.

But the placement of "In God We Trust" on currency does not date back to the Founding. Congress placed the motto on money for the first time in 1864 (72 years after the ratification of the Bill of Rights), and did not place it on all coinage until 1955 (163 years after ratification). By contrast, "[t]he motto of the new nation, proposed . . . by Franklin, Adams, and Jefferson, and adopted for use in the Great Seal of the United States in 1782, was 'E Pluribus Unum.'" William Van Alstyne, Trends in the Supreme Court: Mr. Jefferson's Crumbling Wall—A Comment on Lynch v. Donnelly, 1984 Duke L.J. 770, 774. And "[t]he original legend on new coins, first on continental dollars, then on the fugio cent minted in Philadelphia, in 1787, was 'Mind Your Business.'" Id. Thus, the motto's history of inclusion on the currency tells us nothing about what the Framers thought, and does not say much of anything about what the Establishment Clause means.

Because, in this case, Galloway presents as many questions as it answers, the better approach is to resort to what the Supreme Court has already told us. The Court has expressed a view that—irrespective of the Establishment Clause test applied—printing the motto on currency is permissible. The Court has listed the

-20-

motto amongst permissible "reference[s] to our religious heritage," <u>Lynch v. Donnelly</u>, 465 U.S. 668, 676 (1984),[14] acknowledged that the motto is "consistent with the proposition that government may not communicate an endorsement of religious belief," <u>Cty. of Allegheny v. ACLU</u>, 492 U.S. 573, 602–03, and explained that "[t]he bearer of currency is . . . not required to publicly advertise the national motto," <u>Wooley v. Maynard</u>, 430 U.S. 705, 717 n.15 (1977). Though none of these cases directly presented the question of the motto's constitutionality, we "are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings." <u>Jones v. St. Paul Cos.</u>, 495 F.3d 888, 893 (8th Cir. 2007) (cleaned up). The Court's dicta dispose of the Plaintiffs' Establishment Clause claim, as our sister circuits have held. <u>See, e.g.</u>, <u>Newdow v. Peterson</u>, 753 F.3d 105, 108 (2d Cir. 2014). As the Seventh Circuit put it: "If the Court proclaims that a practice is consistent with the [E]stablishment [C]lause, we take its assurances seriously. If the Justices are just pulling our leg, let them say so." <u>Sherman v. Cmty. Consol. Sch. Dist. 21</u>, 980 F.2d 437, 448 (7th Cir. 1992).

---

[14]Notably, all of the opinions in <u>Lynch</u>—majority, concurrence, and dissent— agreed that the motto is constitutional. <u>Compare</u> <u>Lynch</u> 465 U.S. at 676 (majority), <u>and</u> <u>id.</u> at 692–93 (O'Connor, J., concurring) ("[T]he government's display of the crèche . . . [is] no more an endorsement of religion than such governmental 'acknowledgments' of religion as legislative prayers of the type approved in <u>Marsh</u> . . ., government declaration of Thanksgiving as a public holiday, printing of 'In God We Trust' on coins, and opening court sessions with 'God save the United States and this honorable court.'" (cleaned up)), <u>with</u> <u>id.</u> at 716 (Brennan, J., dissenting) ("I would suggest that such practices as the designation of 'In God We Trust' as our national motto, or the references to God contained in the Pledge of Allegiance can best be understood . . . as a form a 'ceremonial deism,' protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content." (cleaned up)).

For these reasons, I concur only in the court's judgment that the Plaintiffs' Establishment Clause claim fails.  I otherwise concur in the court's opinion.

_____