*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CM-216

GASTON DE BÉARN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-16158-18)

(Hon. John Ramsey Johnson, Trial Judge)

(Submitted May 5, 2020                       Decided September 10, 2020)

*Jenifer Wicks* was on the brief for appellant.

*Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman, Suzanne Grealy Curt, Brian Kelly*, and *Matthew Covert*, Assistant United States Attorneys, were on the brief for appellee.

Before THOMPSON, EASTERLY, and MCLEESE, *Associate Judges*.

THOMPSON, *Associate Judge*: On March 15, 2019, appellant Gaston De Béarn was convicted following a bench trial of one count of destruction of property and two counts of contempt. On appeal he argues that there was insufficient evidence to support his conviction, that he is entitled to reversal of his convictions because his left hand was shackled during trial without an individualized finding

by the court that this security measure was needed, and that the stay-away order underlying appellant's contempt-of-court convictions violated the Religious Freedom Restoration Act ("RFRA").[1] We disagree and therefore affirm.

## I.

The evidence at trial was as follows. On October 31, 2018, at around 5:30 p.m. an evening mass was in progress in the crypt church at the Basilica of the National Shrine of the Immaculate Conception, which is located at 400 Michigan Avenue, N.E. ("the Shrine"). Appellant entered the church "yelling" about the "need[] to restore the traditional mass." Bryan Maynard, an agent with the Federal Bureau of Investigations who happened to be attending the mass, testified that appellant ran up towards the altar, denouncing the mass as "illegitimate," using "expletives," and telling "everybody to stop." He then proceeded to walk straight up to the altar, knock over three candlesticks one by one, and head towards the officiating priest (at which point Maynard and others "moved forward to apprehend" appellant). As the candlesticks fell in succession, Maynard observed

---

[1] *See* 42 U.S.C. § 2000bb *et seq.*

"debris fall," and saw "bits of the brass or bronze, whatever the candlesticks were made of, breaking apart."[2]

The officiating priest asked appellant to leave, but appellant continued to protest, prompting Maynard to head to the altar, grab appellant, and assist other churchgoers in "forcibly walk[ing] [appellant] from the crypt."  After Metropolitan Police Department officers arrived, they arrested appellant for destruction of property and unlawful entry.   Appellant was ordered by the court to stay away from the Shrine as a condition of his release, and the head of Shrine security testified that a Shrine security officer issued appellant a barring order.  However, Shrine security officers observed appellant return for masses on November 18, 2018, and November 25, 2018.[3]  Appellant was charged with contempt of court for violating the stay away order on each occasion.

The government introduced photographic evidence of the damage to the candlesticks as well as testimony that the candlesticks had been crafted out of

---

[2] Sister Bernadette Miller, who was also in attendance,  similarly testified that after appellant began "flailing violently" at the candlesticks on the altar, "they clapped to the ground and . . . broke."

[3] Appellant's presence at these services was corroborated by his own admissions, as well as by a donation check he left at the church on November 25, 2018.

bronze in France in 1929 and were "specifically made for the basilica, custom made."  The labor costs for fixing them amounted to $1000.

During his testimony, appellant — an attorney, who represented himself at trial accompanied by his "associate" (apparently, appointed standby counsel) — conceded that he "intentionally . . . toppled over" the candlesticks, but contended that he did so "very carefully" in such a way that they were "not harmed or broken at all."  With regard to the contempt charges, appellant conceded that he "returned twice to the National Shrine against the plain language of the stay away order" issued by the court on November 6, 2018.  However, he argued that the stay-away order imposed against him violated RFRA because it "prevent[ed] a faith[ful] Roman Catholic from practicing his religion according to his sacred concepts."

The trial court acquitted appellant of unlawful entry relating to his refusal to leave the Shrine when asked by the priest on October 31, 2018,[4] but convicted him of malicious destruction of property and two counts of contempt for violating the court's stay-away order.  The court imposed a suspended sentence and probation and required appellant to pay restitution and $150 in fines.

---

[4]  Appellant was not charged with unlawful entry for having returned to the Shrine on November 18, 2018, and November 25, 2018.

## II.

The background of appellant's hand-shackling argument is as follows. On the morning when trial was about to begin, the trial court granted a request by appellant to be unshackled.[5] However, after a recess, and before opening statements began, the court informed appellant that because there was only one United States Marshal present, his left hand had to be shackled. Appellant replied,

> I do have my right hand but I like to use piles. I have lots of things and books. I kind of like both hands as a lawyer. Both hands is nice. It worked well in the first part of the hearing but if you don't want it now, that's fine. Okay.

The trial court told appellant that it was "a matter of the rules [the Marshals] operate under[,]" and had "nothing to do with [appellant]." Citing *Deck v. Missouri*, 544 U.S. 622 (2005), appellant contends that the trial court's

---

[5] Appellant was in custody pursuant to a bench warrant that had been issued after he failed to appear for his original trial date the day before.

acquiescence in his restraint without individualized justification was reversible error.[6]

We agree that there was trial court error here. Specifically, we conclude that the trial court's unquestioning "defer[ence] to the recommendation of [a United States Marshal] as to the appropriateness of shackling without independently reviewing the facts and circumstances thought to warrant such a security measure and carefully considering the legal ramifications of that decision" *United States v. Mayes*, 158 F.3d 1215, 1226 (11th Cir. 1998), amounted to an erroneous exercise of discretion.[7] We also conclude, however, that the error in this case was harmless

---

[6] The Supreme Court held in *Deck* that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." 544 U.S. at 629. That holding gives effect to three important principles: the presumption of innocence, the right to counsel, and preservation of "[t]he courtroom's formal dignity, which includes the respectful treatment of defendants[.]" *Id.* at 630–31.

[7] Numerous courts have employed similar reasoning. *See, e.g., Hameed v. Mann*, 57 F.3d 217, 222 (2d Cir. 1995) ("In determining what restraints are necessary, the court cannot properly delegate that decision to guards or other prison officials but must decide that question for itself."); *Lemons v. Skidmore*, 985 F.2d 354, 358 (7th Cir. 1993) (noting that "[w]hile [the trial judge] could have consulted the Department of Corrections employees or court security officers, and listened to their opinions and the reasons in support of them, he had to . . . ultimately make the [shackling] decision himself[,]" and reasoning that where a trial judge "delegates a decision, and gives no reason for the decision, that is not an exercise of discretion but an absence of and an abuse of discretion"); *United States*

(continued…)

under any standard of review and that reversal of appellant's convictions therefore is not warranted, even assuming (without deciding) that the shackling of appellant during his bench trial had Due Process implications. Resolving the appeal on that basis, we need not decide, and we decline to decide, whether the holding of *Deck* should be extended to nonjury trials — an issue on which courts are split.[8]

In this case, the trial court did not base its shackling decision on the case law declining to apply *Deck* in the context of bench trials. Nor did the court make a discretionary judgment about whether restraints were needed for "the safety of

---

(…continued)
*v. Samuel*, 431 F.2d 610, 615 (4th Cir. 1970) ("As a discretionary matter, the district judge's decision with regard to measure for security is subject to limited review to determine if it was abused. We stress that the discretion is that of the district judge. He may not . . . delegate that discretion to the Marshal."); *see also State v. Walker*, 344 P.3d 227, 231 (Wash. 2015) ("While prison officials may be well positioned to assist the trial court in deciding matters of courtroom security, they are in no position to weigh and balance the many factors the court must consider when determining whether, and in what manner, a defendant should be restrained during a court proceeding.").

[8] *Compare, e.g.*, *United States v. Lafond*, 783 F.3d 1216, 1225 (11th Cir. 2015) ("[T]he rule against shackling pertains only to a jury trial[.]"), *with United States v. Sanchez-Gomez*, 859 F.3d 649, 661 (9th Cir. 2017) (reasoning that *Deck* "applies whether the proceeding is pretrial, trial, or sentencing, with a jury or without" and holding that "the court must make an individualized decision that a compelling government purpose would be served and that shackles are the least restrictive means for maintaining security and order in the courtroom"), *cert. granted in part*, 138 S. Ct. 543, 199 L. Ed. 2d 422 (2017), *vacated on other grounds and remanded*, 138 S. Ct. 1532, 200 L. Ed. 2d 792 (2018).

jurors, attorneys, and witnesses in [the] courtroom." *United States v. Van Sach*, 458 F.3d 694, 699 (7th Cir. 2006). Rather, the court rested its ruling solely on "the rules [the U.S. Marshals] operate under." As noted above, the court had initially granted appellant's request to be unshackled but then reversed its decision after appellant told the court that the Marshal was requiring that his hand be shackled, telling appellant that the decision not to unshackle appellant "ha[d] nothing to do with [appellant]."

We do not disagree with courts that have reasoned that a court "may rely heavily on the U.S. Marshal's advice when deciding whether defendants should be shackled during trial." *United States v. Fields*, 483 F.3d 313, 357 (5th Cir. 2007) (quoting *United States v. Ellender*, 947 F.2d 748, 760 (5th Cir. 1991)). However, courts that have made similar statements have done so in cases where there were demonstrated safety risks and the trial court "offered detailed reasons for its shackling order." *United States v. Maes*, 961 F.3d 366, 376 (5th Cir. 2020) (upholding district court's shackling order where the court had explicitly based its decision not only upon the fact that the Marshals believed that the defendant presented a security risk and a flight risk, but also upon fact that he was a fugitive until he was arrested, had a history of failing to appear in court, and also faced a significant sentence); *see also United States v. Williams*, 629 F. App'x 547, 552–

53 (4th Cir. 2015) (giving weight to the fact that the trial court had received a shackling recommendation from the U.S. Marshals Service, because the recommendation was "based on, among other things, [the defendant's] extensive criminal record and the seriousness of the current charges"); *Fields*, 483 F.3d at 357 (5th Cir. 2007) (reasoning that the trial court's "failure to assign reasons for physically restraining a defendant – though erroneous – [wa]s not 'reversible error' where those reasons '[were] readily apparent to us from the record[,]'" which showed that the defendant "(1) had a violent criminal history, (2) had been 'aggressive, volatile, and lewd' while in custody, and (3) had a 'history of escape and escape attempts'").

This case did not present a situation in which shackling was self-evidently necessary. Although the record shows that appellant was facing trial on a misdemeanor simple assault charge in addition to the charges involved in this case, in this case he was a misdemeanor defendant who had been apprehended for toppling over candlesticks inside a church. Further, even if some type of restraint was warranted, given the Supreme Court's observation that shackles may "tend to confuse and embarrass defendants' mental faculties,"[9] the trial court had a duty to

---

[9] *Deck*, 544 U.S. at 631 (quoting *People v. Harrington*, 42 Cal. 165, 168 (1871) (internal quotation marks and brackets omitted)).

consider whether the hand shackle might impede appellant's ability to represent himself[10] and, for example, whether it would have been possible to use an ankle shackle instead to allow appellant to better take notes, for "[c]ourts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." *Estelle v. Williams*, 425 U.S. 501, 504 (1976).

Nevertheless, we are satisfied that the error here does not warrant reversal of appellant's convictions. The Supreme Court reasoned in *Deck* that shackling a defendant "almost inevitably implies to a jury, as a matter of commonsense, that court authorities consider [him] a danger to the community" and "thereby inevitably determines the jury's ability to weigh accurately all relevant considerations[.]" *Deck*, 544 U.S. at 633. We see no danger here that the shackling influenced the trial judge's assessment of appellant's guilt or affected his ability to weigh the evidence in appellant's case. The judge told appellant that the shackling had nothing to do with him, and went on to acquit him of unlawful entry. Further,

---

[10] To the extent that the court considered this, it seemed to recognize that there might be some adverse effect on appellant's ability to take notes. The court instructed appellant to "remain seated [during the government's opening statement] and take some notes . . . [a]t least mental notes, if not physical notes." However, the court did point out that appellant could use his "associate" to hand items to witnesses during his questioning of them.

appellant has not shown how the trial court's shackling decision affected his trial strategy, hampered his interactions with witnesses, or otherwise impaired his *pro se* representation. While appellant did voice his desire to use both of his hands to manipulate his documents during trial, he actually appeared to acquiesce in the court's ruling, and his "associate" was available to assist him with handling exhibits. Furthermore, the record is devoid of evidence that appellant was in any way cowed, or that his ability to defend himself was compromised, by the trial court's decision to keep him partially shackled during trial. He cross-examined every government witness, looked at his notes before doing so (showing that he was able to take notes), made numerous objections, moved for a judgment of acquittal at the close of the government's case-in-chief and later renewed the motion, arranged to put an exhibit on the overhead, zealously raised his RFRA defense, testified in his own defense, and received compliments from both the trial court and his standby counsel for his performance at trial. In addition, as discussed below, the evidence of appellant's guilt as to both destruction of property and contempt of court was overwhelming. "[W]e do not think there is any reasonable possibility that [appellant's] appearance in handcuffs contributed to [the trial court's] finding of guilt." *People v. Best*, 979 N.E.2d 1187, 1189 (N.Y. 2012).

**III.**

Appellant next contends that there was insufficient evidence to support his conviction for destruction of property. "We review sufficiency claims de novo, viewing the evidence in the light most favorable to the prosecution, with due regard for the right of the . . . trier of fact to weigh the evidence, to determine the credibility of witnesses, and to draw reasonable inferences." *In re D.P.*, 122 A.3d 903, 907 (D.C. 2015) (internal quotation marks and brackets omitted). "The evidence is sufficient if, after viewing it . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Solon v. United States*, 196 A.3d 1283, 1289 (D.C. 2018) (internal brackets omitted).

Appellant was convicted under D.C. Code § 22-303, which provides, in relevant part that "[w]hoever maliciously injures or breaks or destroys, or attempts to injure or break or destroy, by fire or otherwise, any public or private property, whether real or personal, not his or her own," shall be found guilty of malicious destruction of property. D.C. Code § 22-303 (2012 Repl. & 2020 Supp.). This court has defined malice as

> (1) the absence of all elements of justification, excuse or recognized mitigation, and (2) the presence of *either* (a) an actual intent to cause the particular harm which is produced or harm of the same general nature, *or* (b) the wanton and willful

> doing of an act *with awareness of a plain and strong likelihood that such harm may result*.

*Harris v. United States*, 125 A.3d 704, 708 (D.C. 2015) (quoting *Guzman v. United States*, 821 A.2d 895, 898 (D.C. 2003)) (footnote omitted). Malice can be found even where the accused did not intend "the actual harm which resulted from his wrongful acts[,]" *id.*, because "[a]ll that is required is a conscious disregard of a known substantial risk of the harm which the statute is intended to prevent." *Id.* (quoting *Gonzalez v. United States*, 859 A.2d 1065, 1067 (D.C. 2004)).

Here, appellant concedes that "the facts presented at trial clearly demonstrated that [appellant's] flailing arms tipped over . . . candle holders . . . of the Crypt Church[.]" He highlights, however, that there were no "before-and-after photographs" of the candlesticks and that only two of the three fallen candlesticks were dented, and he contends that the "minor dent[s]" in two of the candlesticks could have been pre-existing and could have "occurred during a regular cleaning of the sanctuary . . . or any other time during which the Shrine's staff could have carelessly dropped or damaged the candlestick[s] over the course of the nearly 90

years during which the [S]hrine claims to have owned and maintained [them]."[11] He also claims that his actions were "gentle and reasonable," showing that he lacked the requisite malice to be found guilty of destruction of property.

It is well-settled that a fact-finder ordinarily may infer that a defendant intends the natural and foreseeable consequences of the defendant's actions. *See, e.g.*, *Corbin v. United States*, 120 A.3d 588, 591 n.3 (D.C. 2015). Given the testimony that appellant toppled the remaining two candlesticks after the first one that he toppled broke into pieces, a reasonable fact finder could infer that appellant knew that those candlesticks would sustain damage as well if he knocked them over, which he conceded at trial he did intentionally (because he "wanted to make a point"). At the very least, appellant's "flailing" actions were taken with an "awareness of a plain and strong likelihood" that the candlesticks might be damaged. *Harris*, 125 A.3d at 708. Though appellant's version of the events differs from that of Sister Miller and Mr. Maynard, "the fact-finder was entitled to believe either version of how much force [appellant] used when [knocking over the candlesticks] and how much damage resulted from the use of that force." *Jackson v. United States*, 819 A.2d 963, 967 (D.C. 2003). Appellant's arguments amount

---

[11] At trial, by contrast, appellant vacillated between alleging that that no damage was done to the candlesticks and admitting that he had caused them damage.

to insistence that we look at the evidence in the light most favorable to him, which is contrary to our standard of review. His arguments also overlook that the government is not required to "negate every possible inference of innocence." *Paige v. United States*, 25 A.3d 74, 89 (D.C. 2011). We are satisfied that the evidence was sufficient for the trial court to find appellant guilty of malicious destruction.

## IV.

Finally, appellant argues that his two convictions of contempt for violation of the court's stay-away order contravene RFRA. Even if that were so, this court has made clear that "[c]ompliance with court orders is required until they are reversed on appeal or are later modified." *Baker v. United States*, 891 A.2d 208, 212 (D.C. 2006). Thus, "even assuming for the sake of argument that the trial court's [stay away] order was invalid [under RFRA], [appellant's] conviction for contempt must be upheld for his failure to comply with that order." *Id.*; *see also Bansda v. Wheeler*, 995 A.2d 189, 196 (D.C. 2010) (holding that party's contempt conviction must be upheld even if the trial court's order was invalid).

We also find no merit to appellant's RFRA argument. RFRA provides in relevant part that the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). In order to prevail on a claim or defense under RFRA, an individual "must show by a preponderance of the evidence that the government action in question would substantially burden the sincere exercise of his religion, whereupon the burden of proof shifts to the government to show that the action (1) would further a compelling governmental interest (2) that cannot be effectuated by less restrictive means." *Nesbeth v. United States*, 870 A.2d 1193, 1196 (D.C. 2005) (citing to 42 U.S.C. § 2000bb-1). The government substantially burdens religion when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707, 718 (1981), or requires an individual to choose between "abandoning his religious principle or facing criminal prosecution." *Braunfeld v. Brown,* 366 U.S. 599, 605 (1961). Appellant contends that the trial court improperly rejected his RFRA defense without applying these standards.

Appellant's brief proceeds directly to the second prong of the RFRA test, arguing that the court's stay-away order did not further a compelling governmental interest, and that even if it did, it was not the "least restrictive means" of doing so.

But he fails to explain why a stay-away order that prohibited him only from practicing his religion "in the church of his choice[]" constitutes a substantial burden, and thus he has not met his burden with respect to the first prong of RFRA.

The trial court told appellant, "[N]obody's saying you can't practice your religion, they're just saying at that particular place where you messed up, you can't come back there for a while." We have no trouble in recognizing that, while not saying so in so many words, the trial court found that appellant lacked a RFRA defense because he had not demonstrated that the stay away order substantially burdened his exercise of religion. We agree.

"Not just any imposition on religious exercise creates a substantial burden; a burden must have some degree of severity to be considered substantial." *New Doe Child #1 v. Cong. of the U.S.*, 891 F.3d 578, 590 (6th Cir. 2018) (quoting *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1003 (6th Cir. 2017)) (internal quotation marks and brackets omitted); *see also Perrier-Bilbo v. United States*, 954 F.3d 413, 432 (1st Cir. 2020) (conceding that the appellant "might find the options offered by the Government subjectively burdensome," but holding that the trial court "was right to conclude that not every imposition or inconvenience rises to the level of a 'substantial burden'"); *New Doe Child #1 v.*

*United States*, 901 F.3d 1015, 1026–27 (8th Cir. 2018) (noting that "not all burdens constitute substantial burdens" and that a "mere inconvenience" does not always amount to a substantial burden) (internal quotation marks omitted).

One example is particularly illustrative here. In *United States v. Forchion*, No. 04-949-ALL, 2005 U.S. Dist. LEXIS 14791 (E.D. Pa. July 22, 2005), two Rastafarians were charged for smoking marijuana in a national park in violation of 36 C.F.R. § 2.35(b)(2), which prohibits the possession of a controlled substance in a national park. *Id.* at *4. The defendants asserted a RFRA defense. *Id.* at *5. In affirming their convictions, the court concluded that because 36 C.F.R. § 2.35(b)(2) did not forbid Rastafarians from possessing marijuana outside of national parks, there was "no impediment to the free exercise of their faith in their homes, their houses of worship, or other non-federal locations." *Id.* at *14. Accordingly, "[w]ith so many alternative places to practice Rastafarianism, the ban on marijuana possession in national parks d[id] not force [the defendants] to choose between abandoning their faith and facing criminal prosecution." *Id.* Therefore, the court reasoned, the magistrate judge "did not clearly err in finding that [36 C.F.R. § 2.35(b)(2)] did not substantially burden [the defendants'] religious beliefs." *Id.*

At trial, appellant noted that the Shrine was his "favorite" place to attend mass and that he did not "go to other churches" because they are "just not as beautiful as that one." He acknowledged, however, that he could go to other churches. "With so many alternative places to practice [his religion]," we are satisfied that the stay-away order imposed on appellant as to a single Catholic church "d[id] not force [appellant] to choose between abandoning [his] faith and facing criminal prosecution." *Id.* Appellant has pointed to no evidence suggesting that attending another place of worship would force him to "violate his beliefs[.]"[12] *Thomas,* 450 U.S. at 718. Accordingly, our RFRA analysis ends here.

Wherefore, the judgment of the trial court is

*Affirmed.*

---

[12] Moreover, in his opening remarks to the court, appellant acknowledged that he did what he did at the Shrine on the day in question because he "just wanted to make a disturbance" and "get people's attention" and hoped for press coverage — not because interrupting mass at the Shrine or toppling candlesticks there is part of his religious practice.